Rel: March 27, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

———————————————

## CR-2023-0545

———————————————

## Roderick Byrd

## v.

## State of Alabama

## Appeal from Jefferson Circuit Court
## (CC-06-2222.60)

MINOR, Judge.

In this appeal we consider whether the Jefferson Circuit Court erred in summarily dismissing Roderick Byrd's petition for relief under Rule 32, Ala. R. Crim. P., in which he challenged his 2007 convictions for four counts of capital murder and his resulting death sentences. On appeal, Byrd argues: (1) that his petition was timely filed; (2) that he is

intellectually disabled and thus ineligible for the death penalty and that his trial counsel were ineffective in developing and presenting evidence to show that he is intellectually disabled; (3) that he was constructively denied counsel; (4) that his trial counsel were ineffective during jury selection; (5) that his trial counsel were ineffective in negotiating a plea; (6) that his trial counsel were ineffective during the guilt phase; and (7) that his trial counsel were ineffective during the penalty phase and at the sentencing hearing before the trial court. For the reasons below, we affirm.

## FACTS AND PROCEDURAL HISTORY

On direct appeal in 2009, this Court summarized the relevant facts and procedural history of the proceedings leading to Byrd's convictions and death sentences:

> "On November 24, 2005, Thanksgiving Day, Brandon Mitchell went to Byrd's sister, Hellena Byrd's apartment in Birmingham, Alabama, where Roderick Byrd and Jonathan Floyd also lived. Mitchell woke Byrd and enlisted Byrd's and Floyd's aid in his plan to commit a robbery at the Airport Inn (hereinafter 'the Inn'). After agreeing to help Mitchell commit the robbery, Byrd returned to his bedroom and put on a black shirt, black pants, and black shoes. Shortly thereafter, Floyd drove Mitchell and Byrd to the Inn in Floyd's automobile.

> "According to Byrd's statement, while they were in the parking lot of the Inn, Mitchell, Floyd, and Byrd discussed the

2

robbery. At some point before entering the Inn, Byrd put on a pair of black gloves to prevent leaving physical evidence of his participation in the crime; however, neither he nor Mitchell, who had previously been employed at the Inn, made any attempt to conceal their facial identities.[1] Thereafter, Mitchell and Byrd entered the Inn—each armed with one pistol—and encountered Kim Olney, the desk clerk, and John Aylesworth, a truck driver, who was waiting in the lobby for a ride to Texas.

"Once in the Inn, Mitchell focused his attention on Olney while Byrd used his pistol to subdue Aylesworth, a former Marine. At some point during the robbery, Dorothy Smith, a traveler from New York who was in Alabama visiting family for Thanksgiving, entered the lobby of the Inn to rent a room for the night. After she entered the lobby, Smith, like Olney and Aylesworth, was held at gunpoint. During this time, Mitchell took approximately $300 from a cash drawer that was located behind the clerk's desk and also tried unsuccessfully to open a safe. Mitchell and Byrd also took various items from the three victims, including a tote bag, a duffel bag, clothes, and money. During these events, Olney, Aylesworth, and Smith were each shot behind the ear at close range with .38 caliber pistols.[2] Olney was also shot in the arm. All three victims died as result of a gunshot wound to the head. Forensic testing of the projectiles recovered from the crime scene and the victims' bodies established that Olney and Smith were shot with the same .38 caliber pistol and that Aylesworth was shot with a different .38 caliber pistol.

"After the robbery, Mitchell and Byrd left the Inn on foot. They traveled around to the back of the Inn and climbed a fence that separated the Inn from a neighborhood. Clifford Davis and James Jackson, who lived in one of the houses behind the Inn, saw two men, carrying various items, climb the fence and enter the neighborhood. Although Davis and Jackson could not make a positive identification, they testified that one of the two men they saw climb the fence was wearing

3

all black, including black shoes. Davis and Jackson testified that after the two men climbed the fence and entered the neighborhood, they went in different directions.

"Shortly after Mitchell and Byrd separated, Mitchell telephoned Floyd and asked Floyd to come pick him up. Floyd found Mitchell near First Avenue in Birmingham and drove Mitchell to Fifth Avenue South. Floyd dropped Mitchell off on Fifth Avenue and then drove around looking for Byrd. After unsuccessfully searching for Byrd, Floyd returned to Hellena Byrd's apartment where he found Byrd crying and shaking. At that point, Byrd made a statement to Floyd indicating that Mitchell shot all three people at the Inn.

"Floyd and Byrd remained at the apartment for approximately 30 minutes. Then they, along with Hellena Byrd and Byrd's girlfriend, Lasundra Mosley, went to Byrd's grandmother's house, where they ate Thanksgiving dinner.

"At some point after Thanksgiving, Byrd went to Georgia where he was apprehended. While in Georgia at the Henry County jail, Byrd gave a statement to two Birmingham police officers in which he confessed to participating in the robbery, but denied any involvement in the murders.

"_____

"[1]The video of the crime recorded by a security camera shows that Mitchell had a knit cap or ski mask on his head; however, the cap was not covering his face, and he eventually removed it from his head.

"[2]The security video from the lobby of the Inn shows Mitchell shooting Olney."

Byrd v. State, 78 So. 3d 445, 448-49 (Ala. Crim. App. 2009).

At the penalty phase, the jury recommended, by an 11-1 vote, that

4

Byrd receive a death sentence for counts 1, 2, and 4. As to count 3, the jury recommended a death sentence by a 10-2 vote. The trial court followed the jury's recommendation and sentenced Byrd to death on all four counts.

This Court affirmed Byrd's convictions and death sentences. Byrd, 78 So. 3d 445. The Alabama Supreme Court denied Byrd's petition for the writ of certiorari. Ex parte Byrd (No. 1081250, Aug. 19, 2011), cert. denied, Byrd v. Alabama, 565 U.S. 1205 (2012). This Court issued a certificate of judgment on August 19, 2011, making Byrd's convictions and sentences final.

In August 2012, Byrd, through counsel, timely filed a postconviction petition under Rule 32, Ala. R. Crim. P., challenging his convictions and sentences. (Supp. C. 318.) Over the next decade, the case was reassigned to different judges. Byrd amended his petition four times, and the State moved to dismiss each amended petition.

In June 2023, the circuit court summarily dismissed the petition. (C. 77.) Byrd moved for reconsideration and timely appealed.[1] (C. 95,

---

[1]The circuit court did not rule on the motion for reconsideration before it lost jurisdiction to modify its judgment dismissing the petition.

5

928.)

## STANDARD OF REVIEW

"'[Byrd] has the burden of pleading and proving his claims. As Rule 32.3, Ala. R. Crim. P., provides:

"'"The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence."

"'"The standard of review this Court uses in evaluating the rulings made by the trial court [in a postconviction proceeding] is whether the trial court abused its discretion." Hunt v. State, 940 So. 2d 1041, 1049 (Ala. Crim. App. 2005). However, "when the facts are undisputed and an appellate court is presented with pure questions of law, [our] review in a Rule 32 proceeding is de novo." Ex parte White, 792 So. 2d 1097, 1098 (Ala. 2001). "[W]e may affirm a circuit court's ruling on a postconviction petition if it is correct for any reason." Smith v. State, [122] So. 3d [224], [227] (Ala. Crim. App. 2011).

"'... [Some] of the claims raised by [Byrd]

---

Thus, the motion was denied by operation of law. Matthews v. State, 363 So. 3d 1028, 1031 (Ala. Crim. App. 2021).

6

were summarily dismissed based on defects in the pleadings …. When discussing the pleading requirements for postconviction petitions, we have stated:

> "'"The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So. 2d 724 (Ala. Crim. App. 2003)."

"'Hyde v. State, 950 So. 2d 344, 356 (Ala. Crim. App. 2006) [(emphasis removed)].

> "'"'Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.' Boyd v. State, 746 So. 2d 364, 406 (Ala. Crim. App. 1999). In other words, it is not the pleading of a conclusion 'which, if true, entitle[s] the petitioner to relief.' Lancaster v. State, 638 So. 2d 1370, 1373 (Ala. Crim. App. 1993)[, overruled on other grounds by Robey v. State, 950 So. 2d 1235 (Ala. Crim. App. 2006)]. It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if

7

true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R. Crim. P., to present evidence proving those alleged facts."

"'Boyd v. State, 913 So. 2d 1113, 1125 (Ala. Crim. App. 2003) [(emphasis removed)]. "[T]he procedural bars of Rule 32[.2, Ala. R. Crim. P.,] apply with equal force to all cases, including those in which the death penalty has been imposed." Burgess v. State, 962 So. 2d 272, 277 (Ala. Crim. App. 2005).

"'Some of [Byrd's] claims were also dismissed based on his failure to comply with Rule 32.7(d), Ala. R. Crim. P. In discussing the application of this rule we have stated:

"'"[A] circuit court may, in some circumstances, summarily dismiss a postconviction petition based on the merits of the claims raised therein. Rule 32.7(d), Ala. R. Crim. P., provides:

"'"'If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or

8

grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.'

"'"'"Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously <u>without merit</u> or is precluded, the circuit court [may] summarily dismiss that petition."' <u>Bishop v. State</u>, 608 So. 2d 345, 347-48 (Ala. 1992) (emphasis added) (quoting <u>Bishop v. State</u>, 592 So. 2d 664, 667 (Ala. Crim. App. 1991) (Bowen, J., dissenting)). <u>See also</u> <u>Hodges v. State</u>, 147 So. 3d 916, 934 (Ala. Crim. App. 2007) (a postconviction claim is 'due to be summarily dismissed [when] it is meritless on its face')[, <u>rev'd on other grounds</u>, <u>Ex parte Hodges</u>, 147 So. 3d 973 (Ala. 2011)]."

"'<u>Bryant v. State</u>, 181 So. 3d 1087, 1102 (Ala. Crim. App. 2011).'

"<u>Washington v. State</u>, 95 So. 3d 26, 38-39 (Ala. Crim. App. 2012).

"....

"Finally, '[a]lthough on direct appeal we reviewed [Byrd's] capital-murder conviction for plain error, the plain-error standard of review does not apply when an appellate

court is reviewing the denial of a postconviction petition attacking a death sentence.'[2] James v. State, 61 So. 3d 357, 362 (Ala. Crim. App. 2010) (citing Ex parte Dobyne, 805 So. 2d 763 (Ala. 2001)). With these principles in mind, we review the claims raised by [Byrd] on appeal."

Marshall v. State, 182 So. 3d 573, 580-82 (Ala. Crim. App. 2014).

## ANALYSIS

Byrd argues that the circuit court erred in summarily dismissing his petition. We address his arguments in turn.

## I. TIMELINESS OF THE PETITION

The circuit court found that Byrd's petition was untimely filed under Rule 32.2(c), Ala. R. Crim. P.[3] As Byrd argues and as the State concedes, this finding was erroneous—Byrd filed his petition within a year of his conviction becoming final, and thus the petition was timely

---

[2]Effective January 12, 2023, Rule 45A, Ala. R. App. P., no longer requires this Court to conduct plain-error review on direct appeal in cases involving the death penalty.

[3]Rule 32.2(c), Ala. R. Crim. P., provides, in part:

"[T]he court shall not entertain any petition for relief from a conviction or sentence on the grounds specified in Rule 32.1(a) and (f), unless the petition is filed: (1) In the case of a conviction appealed to the Court of Criminal Appeals, within one (1) year after the issuance of the certificate of judgment by the Court of Criminal Appeals under Rule 41, Ala. R. App. P."

filed.

Although the circuit court erred in finding that the petition was untimely filed, that does not mean that Byrd is due relief. See Spain v. State, 336 So. 3d 1167, 1171 (Ala. Crim. App. 2020) ("Under most circumstances, 'we may affirm a ruling if it is correct for any reason.' Bush v. State, 92 So. 3d 121, 134 (Ala. Crim. App. 2009)."). The circuit court addressed each claim separately and summarily dismissed them for reasons other than timeliness. We thus turn to Byrd's remaining arguments on appeal.

## II. CLAIMS BASED ON ATKINS V. VIRGINIA

In his fourth amended petition, Byrd asserted that he is intellectually disabled and thus ineligible for the death penalty under Atkins v. Virginia, 536 U.S. 304 (2002),[4] and that his counsel were

---

[4]In Atkins v. Virginia, 536 U.S. 304, 321 (2002), the United States Supreme Court held:

"Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that [the death penalty] is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender. Ford [v. Wainwright], 477 U.S. [399,] 405 [(1986)]."

ineffective in presenting his <u>Atkins</u> claim.

## A. <u>ATKINS</u> CLAIM

In Claim I of his fourth amended petition, Byrd asserted that he is intellectually disabled and thus ineligible for the death penalty under <u>Atkins</u>. (C. 135-72.) As the circuit court found, this claim is precluded under Rules 32.2(a)(2) and (4), Ala. R. Crim. P., because Byrd asserted at trial and on direct appeal that he was ineligible for the death penalty under <u>Atkins</u>. (C. 79.) <u>See</u> <u>Byrd</u>, 78 So. 3d at 449-52.

The circuit court did not err in summarily dismissing the claim as precluded under Rules 32.2(a)(2) and (a)(4), and Byrd is due no relief on this claim. <u>See, e.g.</u>, <u>Yeomans v. State</u>, 195 So. 3d 1018, 1047-48 (Ala. Crim. App. 2013) (affirming the circuit court's application of the procedural bar in Rule 32.2(a)(4) to Yeomans's <u>Atkins</u> claim because the issue had been raised on direct appeal).

## B. CLAIM THAT BYRD'S COUNSEL WERE INEFFECTIVE IN DEVELOPING AND PRESENTING HIS <u>ATKINS</u> CLAIM

In Claim II of his fourth amended petition, Byrd asserted that his

---

As this Court recognized in <u>Reeves v. State</u>, 226 So. 3d 711, 722 n.4 (Ala. Crim. App. 2016), courts now follow the trend of using the term "intellectually disabled" rather than the term "mentally retarded."

counsel were ineffective in developing and presenting his <u>Atkins</u> claim. (C. 173-94.) Byrd asserts on appeal that the circuit court's summary dismissal of this claim was improper.

We use these principles in reviewing claims asserting ineffective assistance of counsel:

> "'To prevail on a claim of ineffective assistance of counsel, the petitioner must show (1) that counsel's performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).
>
>> "'"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."

"'Strickland, 466 U.S. at 689 [(citations omitted)].

"'"[T]he purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S. Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) ('We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that '[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' Strickland, 104 S. Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or

14

'what is prudent or appropriate, but only what is constitutionally compelled.' Burger v. Kemp, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)."

"'Chandler v. United States, 218 F.3d 1305, 1313-14 (11th Cir. 2000) (footnotes omitted).

"'An appellant is not entitled to "perfect representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). "[I]n considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987).'

"Yeomans v. State, 195 So. 3d 1018, 1025-26 (Ala. Crim. App. 2013). Additionally, '"[w]hen courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."' Ray v. State, 80 So. 3d 965, 977 n.2 (Ala. Crim. App. 2011) (quoting Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000)).

"We also recognize that when reviewing claims of ineffective assistance of counsel 'the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.' Strickland v. Washington, 466 U.S. 668, 698, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)."

Marshall, 182 So. 3d at 582-83.

Attorneys Emory Anthony and Everett Wess represented Byrd at

15

trial. (Trial R. 2.[5]) For context, we briefly state what the record shows that counsel did to present Byrd's <u>Atkins</u> claim. <u>See</u> <u>Young v. State</u>, 407 So. 3d 1139, 1183-84 (Ala. Crim. App. 2023) ("'"Although petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact."' <u>Ray v. State</u>, 80 So. 3d 965, 979 (Ala. Crim. App. 2011), quoting <u>Chandler v. United States</u>, 218 F.3d 1305, 1320 (11th Cir. 2000).").

On June 15, 2007—the Friday before Byrd's trial was to begin on Monday, June 18, 2007—counsel filed a "Motion Under the Eighth Amendment and <u>Atkins v. Virginia</u> to Order an Evaluation and/or Prevent the Imposition of the Death Penalty." (Trial C. 143.) In that motion, counsel set forth the definition of "mental retardation" as stated

---

[5]"Trial C." refers to the clerk's record in Byrd's direct appeal from his 2007 trial; "Trial R." refers to the reporter's transcript in the direct appeal. <u>See</u> Rule 28(g), Ala. R. App. P. <u>See also</u> <u>Hull v. State</u>, 607 So. 2d 369, 371 n.1 (Ala. Crim. App. 1992) (noting that this Court may take judicial notice of its own records).

On February 1, 2006, the Jefferson District Court appointed attorney Fred Pickard to represent Byrd. (Trial C. 54.) Pickard withdrew from representing Byrd on April 6, 2006. That same day, the district court appointed Wess as counsel for Byrd, and the next day the court appointed Anthony as cocounsel. (Trial C. 55-56.)

in <u>Atkins</u>; asserted that Byrd "may meet this definition per his recently obtained school records," which counsel had obtained the day before filing the motion; asked the trial court to order that Byrd be evaluated; and asked for a hearing at which Byrd could offer evidence, including testimony from an expert. (Trial C. 143-44.) On the day the motion was filed, the trial court granted $1,500 for counsel to hire an expert "to evaluate [Byrd] to determine if he is mentally retarded and his IQ level." (Trial C. 24.) Counsel hired Dr. Kimberley Ackerson, who reviewed records counsel provided to her and who evaluated Byrd.

The trial court held a hearing on the motion on June 18, 2007, before Byrd's trial began. Dr. Ackerson testified at that hearing.[6] On direct appeal, this Court summarized that hearing:

> "The circuit court conducted a hearing on Byrd's motion to remove death as a possible sentence due to mental retardation (hereinafter '<u>Atkins</u> motion' or '<u>Atkins</u> hearing'). (R. 45-79.) During the <u>Atkins</u> hearing, Byrd presented the testimony of Dr. Kimberly Ackerson, a clinical psychologist with a specialty in forensic psychology. He also admitted into evidence his school records. Dr. Ackerson testified that she reviewed Byrd's school records, which included, among other things, a confidential psychological evaluation, a behavioral assessment, and an intellectual assessment. <u>Id.</u> Dr. Ackerson also testified that Byrd was given two IQ tests while he was

---

[6]Dr. Ackerson also testified during the penalty phase. (Trial R. 1086.)

in school. When he was in the seventh grade, Byrd was administered the Wechsler Intelligence Scale for Children, and his score indicated that his full-scale IQ was 65. (R. 50.) Dr. Ackerson appears to testify that she believed that a 95 percent 'confidence interval' regarding Byrd's seventh-grade IQ score indicates that Byrd's IQ 'would fall somewhere between 59 and 71.'[3] (R. 51.) Thereafter, in the 11th grade when he was 17 years old, Byrd was administered the Wechsler Intelligence Scale for Adults, and his score indicated that his full-scale IQ was 75. (R. 52-54.) According to Dr. Ackerson, 'they referred to a 95 percent confidence interval' and that Byrd's 'true IQ is felt to fall anywhere between 71 and 80.' (R. 53.)

"In preparation for Byrd's <u>Atkins</u> hearing, Dr. Ackerson assessed Byrd's IQ using the Wechsler Adult Intelligence Scale, Third Edition. Based on Byrd's performance on that test, Dr. Ackerson testified that his full-scale IQ is 72 and that based on a 95 percent confidence interval, his 'true IQ [is] between 68 and 77.' (R. 55.) Dr. Ackerson also testified that due to the circumstances at the time the test was administered—Byrd was tired and was in jail awaiting a capital-murder trial—she did not believe that he was able to provide his 'best effort' or 'to perform optimally' during the IQ examination. (R. 65-66.)

"_____

"[3]The school report indicates that 'the probability is 90% out of 100 that [Byrd's] true IQ score is between 59 and 71.'"

<u>Byrd</u>, 78 So. 3d at 451. The trial court denied Byrd's <u>Atkins</u> motion, finding that Byrd had failed to show "significantly subaverage intellectual functioning (i.e. an IQ of 70 or below)" or "significant or substantial deficits in adaptive behavior." (Trial C. 25.)

18

Addressing Byrd's <u>Atkins</u> claim on direct appeal, this Court stated:

"Byrd first argues that 'the trial court erred by denying [his] motion to remove the death penalty from consideration ....' (Byrd's Brief at 30.) Specifically, Byrd contends that he is mentally retarded; therefore, his sentence of death constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution as interpreted in <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

"In <u>Atkins</u>, the United States Supreme Court held that the execution of mentally retarded capital offenders violates the Eighth Amendment's prohibition of cruel and unusual punishment. <u>Id.</u> at 321. The Court, however, declined to establish a national standard for determining whether a capital offender is mentally retarded and, instead, left to the states 'the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.' <u>Id.</u> at 317.

"The Alabama Legislature has not yet established a method for determining whether a capital defendant is mentally retarded and, thus, ineligible for a sentence of death. 'However, the Alabama Supreme Court, in <u>Ex parte Perkins</u>, 851 So. 2d 453 (Ala. 2002), adopted the most liberal definition of mental retardation as defined by those states that have legislation barring the execution of a mentally retarded individual.' <u>Smith v. State</u>, 213 So. 3d 255, 266-67 (Ala. Crim. App. 2009) (opinion on return to fourth remand)[, <u>rev'd on other grounds</u>, 213 So. 3d 313 (Ala. 2010)]; <u>see also</u> <u>Smith v. State</u>, 213 So. 3d 239, 248 (Ala. 2007) ('Until the legislature defines mental retardation for purposes of applying <u>Atkins</u>, this Court is obligated to continue to operate under the criteria set forth in <u>Ex parte Perkins</u>.'). Pursuant to <u>Ex parte Perkins</u>, 'to be considered mentally retarded, [a capital defendant] must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or

substantial deficits in adaptive behavior.' <u>Ex parte Perkins</u>, 851 So. 2d at 456; <u>see also</u> <u>Atkins</u>, 536 U.S. at 321 n.5. Further, 'these [two deficits] must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).' <u>Ex parte Perkins</u>, 851 So. 2d at 456; <u>Brownlee v. Haley</u>, 306 F.3d 1043, 1073 (11th Cir. 2002) (recognizing that mental retardation generally requires a showing of an IQ of 70 or below, significant limitations in adaptive skills, and the manifestation of these two deficits during the developmental years). 'Therefore, in order for an offender to be considered mentally retarded in the <u>Atkins</u> context, the offender must currently exhibit subaverage intellectual functioning, currently exhibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18.' <u>Smith v. State</u>, 213 So. 3d at 248; … <u>cf.</u> <u>Ex parte Perkins</u>, 851 So. 2d at 456 (holding that Perkins was not mentally retarded because, among other reasons, Perkins's full-score adult IQ was 76); <u>Roper v. Simmons</u>, 543 U.S. 551, 578-79, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (focusing on defendants' culpability 'when their crimes were committed').

"'In the context of an <u>Atkins</u> claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded.' <u>Smith v. State</u>, 213 So. 3d at 252 …. '"The question of [whether a capital defendant is mentally retarded] is a factual one, and as such, it is the function of the factfinder, not this Court, to determine the weight that should be accorded to expert testimony of that issue."' <u>Smith v. State</u>, 213 So. 3d at 267 (quoting <u>Atkins v. Commonwealth</u>, 266 Va. 73, 581 S.E.2d 514, 515 (2003)). As the Alabama Supreme Court has explained, questions regarding weight and credibility determinations are better left to the circuit courts, 'which [have] the opportunity to personally observe the witnesses and assess their credibility.' <u>Smith v. State</u>, 213 So. 3d at 253 (quoting <u>Smith v. State</u>, 213 So. 3d 226, 239 (Ala. Crim. App. 2006) (Shaw, J., dissenting) ….

20

"'This court reviews the circuit court's findings of fact for an abuse of discretion. Snowden v. State, 968 So. 2d 1004, 1012 (Ala. Crim. App. 2006). '"'A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.'"' Hodges v. State, 926 So. 2d 1060, 1072 (Ala. Crim. App. 2005) (quoting State v. Jude, 686 So. 2d 528, 530 (Ala. Crim. App. 1996) (quoting Dowdy v. Gilbert Eng'g Co., 372 So. 2d 11, 12 (Ala. 1979) (quoting Premium Service Corp. v. Sperry & Hutchinson, Co., 511 F.2d 225 (9th Cir. 1975)))).

"Applying these principles, we conclude that the circuit court correctly determined that Byrd is not mentally retarded and, thus, eligible for a sentence of death. …

"After considering the evidence presented during the Atkins hearing, the circuit court found that Byrd is not mentally retarded and denied his motion. (C.R. 29.) The circuit court grounded its findings 'upon the last two tests that were conducted [indicating that Byrd's IQ was] 72 and 75' and on the fact that Dr. Ackerson did not testify that Byrd is, in fact, mentally retarded. (R. 79; C.R. 29.) The circuit court's findings are supported by the record.

"Based on Dr. Ackerson's evaluation just prior to trial that placed Byrd's IQ at 72, Byrd cannot establish the first requirement under Ex parte Perkins, namely that he 'currently exhibit[s] subaverage intellectual functioning ....' Smith v. State, 213 So. 3d at 248. During oral argument before this court, Byrd argued that although Dr. Ackerson's testing showed that he had an IQ score of 72, she also testified that based on a '95 percent' confidence interval, Byrd's 'true IQ [is] between 68 and 77.' (R. 55.) Byrd then urged this court to presume that his true IQ falls at the low end of the confidence interval—between 68 and 70—and to find that he meets the first requirement under Ex parte Perkins.

21

"There are two fatal flaws in Byrd's argument. First, Byrd bears the burden of establishing by a preponderance of the evidence that he meets the Alabama Supreme Court's criteria for mental retardation. Smith v. State, 213 So. 3d at 252. By relying on the mere possibility that his true IQ falls at the low end of the confidence interval or, as he described it, the 'margin of error,' Byrd has not met his burden to establish that it is more likely than not that his IQ is 70 or below. Second, based on Dr. Ackerson's testimony that Byrd did not perform optimally on the test she administered (R. 65-66), it is possible that his true IQ is above rather than below 72. In any event, this court rejects Byrd's request that we presume that a capital defendant's IQ falls at the bottom range of the confidence interval or 'margin of error' (Byrd's Brief at 30-38), and we hold that Byrd did not establish that he currently exhibits subaverage intellectual functioning.

"Additionally, after reviewing Byrd's two juvenile IQ scores, their confidence intervals, Byrd's school records, and Dr. Ackerson's testimony, we hold that Byrd failed to meet his burden to prove by a preponderance of the evidence that 'subaverage intellectual functioning manifested itself during the developmental period (i.e., before the defendant reached age 18).' Ex parte Perkins, 851 So. 2d at 456. The only evidence Byrd presented during the Atkins hearing that related to his IQ during his developmental years were two IQ scores he received during school evaluations. (R. 50-55; C.R. 365-83.) In the seventh grade, Byrd scored a full-scale IQ of 65, with a confidence interval indicating that Byrd's actual IQ 'would fall somewhere between 59 and 71.' (R. 50-54.) Then, when he was 17, Byrd received a full-scale IQ score of 75, with a confidence interval indicating that his actual IQ would fall somewhere 'between 71 and 80.'[4] (R. 53; C.R. 365-83.)

"Based, in part, on Byrd's full-scale IQ score of 75 at age 17, the circuit court found that Byrd had not met his burden to establish that he is mentally retarded. (R. 75.) Cf. Jackson

22

v. State, 589 So. 2d 781, 784 (Ala. Crim. App. 1991) (citing Bradley v. State, 494 So. 2d 750, 760-61 (Ala. Cr. App. 1985) ('[A] trial court's ruling based upon conflicting evidence ... is binding on this Court ....')). With nothing more than two conflicting juvenile IQ scores, one of which has a confidence interval that indicated that Byrd's true IQ would fall between 71 and 80, the circuit court correctly determined that Byrd failed to meet his burden to establish that he is mentally retarded, i.e., that 'subaverage intellectual functioning manifested itself during the developmental period ....' Ex parte Perkins, 851 So. 2d at 456. Consequently, Byrd has not established that the circuit court abused its discretion by denying his Atkins motion.

"For the foregoing reasons, this court holds that Byrd has not established the first and third requirements under Ex parte Perkins; therefore, the circuit court properly determined that Byrd is not mentally retarded. Consequently, Byrd's execution does not offend the Eighth Amendment. See Atkins, 536 U.S. 304.

"_____

"[4]While Byrd's 11th grade school records indicate that he had 'deficits hinder[ing his academic] success,' this court notes that mental retardation was ruled out as a primary cause of his academic impairment. (C.R. 377.)"

Byrd, 78 So. 3d at 449-52.

In denying Byrd's claim that his counsel were ineffective, the circuit court found:

"In Claim II, [Byrd] claims that he was denied effective assistance of counsel with respect to his Atkins motion during the pretrial, trial, and sentencing phases of his case. Further, [Byrd] alleges that by failing to investigate his possible

23

intellectual disability and to present in full the available evidence of such disability, trial counsel failed to meet reasonable professional standards and that but for their ineffectiveness, he would have been found to be intellectually disabled and ineligible for the death penalty. [Byrd] contends in Claim IX that trial counsel's failures extend to his sentencing which is addressed in greater detail later in this order, given that they had an opportunity to develop and present additional evidence of intellectual disability between the close of trial and sentencing.

"[Byrd] highlights trial counsel's failure to obtain educational records, hire an investigator or psychologist, or present available testimony from family, friends, teachers, and experts as reasons why he was prejudiced during trial. [Byrd] asserts that trial counsel failed to meet reasonable standards of professional performance in offering evidence of [Byrd's] significant subaverage intellectual functioning. [Byrd] contends that evidence of his intellectual functioning was not adequately developed or presented, and evidence of his adaptive functioning deficits was not presented at all.

"[Byrd] discusses at great length the SEM and Flynn Effect tests and how [they] could and should have been used to determine that he was intellectually disabled. [Byrd] offered that Dr. Joel Schneider, Ph.D., who was available at the time of trial, would have testified as to the significance of [Byrd's] scores. Dr. Schneider concluded that [Byrd's] composite IQ scores of 67 (Flynn-adjusted) and 70 (non-Flynn-adjusted) establish a higher degree of confidence that [Byrd] is in the intellectual disability range over any of the individual scores presented. Furthermore, [Byrd] argues that Dr. Daniel Reschly, Ph.D., a school psychologist and expert in mild intellectual disability, was also available at the time of trial. Dr. Reschly would have testified that the SEM and the Flynn Effect were essential to interpreting [Byrd's] IQ scores and that, in his opinion, [Byrd] is intellectually disabled.

24

"The State counters that [Byrd] does not contend that the IQ scores reviewed by this court were incorrect and has not alleged any new facts regarding his IQ scores that, if proven, would show that the results of his trial would have been different. Instead, [Byrd] offers possibilities of what the IQ scores could be using the Fl[ynn] Effect. Both this court and the Alabama Court of Criminal Appeals considered the standard error of measurement testified to by Dr. Ackerson. To the extent that [Byrd] now relies upon the 'Flynn Effect,' no legal or scientific authority requires the application of this theory and [Byrd's] allegations, if proven, fail to establish either deficient performance or prejudice. Dunn v. Reeves, [594 U.S. 31,] 210 L. Ed. 2d 812, 141 S. Ct 2405, 2408 (2021); see also Smith v. State, 112 So. 3d 1108, 1132 (Ala. Crim. App. 2012); Thomas v. Allen, 607 F.3d 749, 757 (11th Cir. 2010) ('[N]o medical association recognizes [the Flynn Effect's] validity.').

"The State contends and this court agrees that trial counsel did present evidence concerning [Byrd's] low intellectual functioning and ADHD. Although [Byrd] claims 'his trial counsel should have done something more, we [must] first look at what the lawyer[s] did in fact.' Reeves v. State, 226 So. 3d 711, 752 (Ala. Crim App. 2016) (internal citations and emphasis omitted). Dr. Ackerson testified that [Byrd] had a low IQ. She testified that, considering the standard margin of error, his true IQ score could be as low as 68 or as high as 77. [Byrd] has failed to show how his trial counsel was ineffective when testimony regarding his low IQ was solicited from Dr. Ackerson by his trial counsel but simply [was] rejected by the court. As such, an appellant cannot relitigate an issue under the guise of ineffective assistance of counsel. Hunt v. State, 940 So. 2d 1041, 1051-52 (Ala. Crim. App. 2005).

"The State points out that after considering the evidence presented at trial, this court determined that [Byrd] is not intellectually disabled. The Alabama Court of Criminal

Appeals reviewed [Byrd's] intellectual disability claim and affirmed this court's finding. See Byrd, 78 So. 3d [445,] 451 ([Ala. Crim. App.] 2012). As the Alabama Court of Criminal Appeals observed, '[w]hile [Byrd's] 11th grade school records indicate that he had "deficits hinder[ing his academic] success," this court notes that mental retardation was ruled out as a primary cause of his academic impairment.' Byrd, 78 So. 3d at 458, fn.4 ….

"This court notes that, although [Byrd] is not intellectually disabled, his low IQ was found by this court to be a non-statutory mitigating circumstance. Therefore, [Byrd's] low IQ was weighed in [Byrd's] favor in this court's decision to sentence him to death. Further, to the extent that [Byrd] alleges that counsel failed to present evidence of adaptive deficits, because significantly subaverage intellectual functioning as measured by intelligence testing is a required component of a meritorious Atkins claim, [Byrd] cannot show deficient performance or prejudice merely by showing that trial counsel failed to present evidence of adaptive deficits. Because [Byrd] is not intellectually disabled, trial counsel could not have raised a meritorious Atkins claim. It is well-established that trial counsel cannot be ineffective for failure to raise a meritless claim. Magwood v. State, 689 So. 2d 959, 979-81 (Ala. Crim. App. 1996).

"[Byrd] not only failed to plead deficit performance in this claim, but he also failed to plead prejudice. 'A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient.' Hyde v. State, 950 So. 2d 344, 356 (Ala. Crim. App. 2006); Rule 32.6(b), Ala. R. Crim. P.; Woods v. State, 221 So. 3d 1125, 1137 (Ala. Crim. App. 2016) (claim was properly dismissed where petitioner failed to plead contents of expert's testimony or how he was prejudiced by the absence of testimony). Because [Byrd] is not intellectually disabled, even given more time, counsel could not have proven he was intellectually disabled. Thus, [Byrd] cannot prove prejudice.

26

"Having considered the allegations of the petition and the arguments of the State and having heard argument from both parties, Claim II is hereby summarily dismissed under Rules 32.3, 32.6(b), and 32.7(d)."

(C. 79-82.)

On appeal, although Byrd asserts that the circuit court erred in summarily dismissing his ineffective-assistance-of-counsel claim, he fails to address the circuit court's judgment in any meaningful way. Almost all of this part of Byrd's brief is simply a condensed version of the claims he raised in his petition asserting that he is intellectually disabled and that his trial counsel were ineffective in preparing for and presenting his <u>Atkins</u> claim.

In his brief, Byrd specifically references only two parts of the circuit court's judgment dismissing his petition. He first refers to a part of the judgment addressing a different ineffective-assistance-of-counsel claim (the alleged ineffectiveness of trial counsel in preparing for the penalty phase—a claim addressed below). (Byrd's brief, p. 37 (citing C. 91-92).) He also refers specifically to the circuit court's "determin[ation] that because Dr. Ackerson testified that [Byrd] had a low IQ, Byrd failed to show how trial counsel was ineffective when 'testimony regarding his low

IQ was solicited from Dr. Ackerson by his trial counsel, but simply rejected by the court.'" (Byrd's brief, p. 45 (citing C. 81).) Byrd asserts that this finding "ignores the substantial case law holding that trial counsel could still be ineffective for proffering some evidence if they fail to present other probative evidence available to them." (Byrd's brief, p. 45.)

Byrd's assertions that the circuit court erred in summarily dismissing his claim do not address in any detail the actual findings of the circuit court. This fails to satisfy Rule 28(a)(10), Ala. R. App. P. See Woodward v. State, 276 So. 3d 713, 746 (Ala. Crim. App. 2018) ("In his brief on appeal, Woodward reasserts this claim from his petition, but he makes no argument regarding why he believes the circuit court's findings were incorrect. This Court has held that similar failures of argument do not comply with Rule 28(a)(10), Ala. R. App. P., and constitute a waiver of the underlying postconviction claim. See, e.g., Morris v. State, 261 So. 3d 1181 (Ala. Crim. App. 2016); Bryant v. State, 181 So. 3d 1087, 1118-19 (Ala. Crim. App. 2011); and Taylor v. State, 157 So. 3d 131, 142-45 (Ala. Crim. App. 2010)."). See also Bohannon v. State, 401 So. 3d 302, 326 (Ala. Crim. App. 2023) ("[I]t should be obvious by now that the practice

of merely copying a Rule 32 claim into an appellate brief is not an argument that complies with Rule 28(a)(10). Yet, for whatever reason, that practice persists, so we take this opportunity to expressly provide the following warning to Rule 32 petitioners and their appellate counsel: Merely copying a Rule 32 claim into an appellate brief, <u>without explaining why the dismissal of the claim was improper</u>, does not comply with Rule 28(a)(10), and such 'arguments' provide this Court with a basis for holding that the claim has been waived and need not be considered on appeal." (emphasis added)).

Even so, for the reasons the circuit court cited in its rejection of the claim, we also hold that Byrd failed to adequately plead his claim that his trial counsel were ineffective in preparing and presenting his <u>Atkins</u> claim. The circuit court did not err in summarily dismissing this claim. <u>See</u> Rule 32.7(d), Ala. R. Crim. P.

### III. CONSTRUCTIVE DENIAL OF COUNSEL

Citing <u>United States v. Cronic</u>, 466 U.S. 648 (1984), Byrd argues that the circuit court erred in summarily dismissing his "claim that he suffered a constructive denial of counsel during the pre-indictment period." (Byrd's brief, p. 49.) Byrd states in his brief an abbreviated

version of the allegations in his petition that he had a "near-total lack of assistance during the almost four months between [his] arraignment and his indictment." (Byrd's brief, p. 50.) Summarizing those allegations, Byrd states:

> "•Byrd's initial counsel, Fred Pickard, did no work on the case whatsoever for approximately two months, and therefore did not provide Byrd with any legal assistance during the critical initial days after his arraignment. …
>
> "•Wess and Anthony likewise did almost nothing between appointment and indictment. They failed to conduct any investigation. … An investigation would have revealed evidence of [Byrd's] intellectual disability. …
>
> "•They failed to meet with the District Attorney's Office or to make any effort to persuade it that indictment on a lesser charge would be appropriate, or to explore the possibility of cooperation or a plea."

(Byrd's brief, pp. 50-51.)

Byrd asserts that, "if counsel had investigated the readily available evidence of his intellectual disability and other mitigating evidence during the pre-indictment phase, counsel could have made a compelling case to the District Attorney that a lesser charge and sentence would be appropriate." (Byrd's brief, p. 51.) He also reiterates his claim that he is intellectually disabled, and he asserts that "raising the issue of whether Byrd was intellectually disabled with the State in the early stages of the

30

case would not have required full litigation of that issue in order to persuade the State that there was a viable Atkins claim that should lead to a non-capital disposition." (Byrd's brief, p. 52 (emphasis in original).)

In rejecting this claim, the circuit court found:

"In Claim III, [Byrd] argues that he suffered constructive denial of counsel during the pre-indictment stage of proceedings. [Byrd] claims that trial counsel failed to investigate [Byrd's] medical, educational, or social history. Additionally, trial counsel failed to meet with his family, or gather educational, employment, or school records that would have indicated his intellectual disability and ineligibility for the death penalty under Atkins. As a result of their failure to investigate, trial counsel were not able to engage with the prosecution with respect to whether a capital murder charge should be sought.

"[Byrd] contends that had trial counsel provided evidence of intellectual disability, there is a reasonable probability that the prosecution would have agreed to a lesser charge or considered a plea involving a sentence with the possibility of parole. However, [Byrd] fails to allege how any lesser sentence would have been available if counsel had started investigating Byrd's intellectual functioning earlier. Additionally, as addressed earlier, the record establishes that Byrd is not intellectually disabled so this claim lacks merit. Claims that do not plead such critical facts do not comply with Rule 32.6(b). Mashburn v. State, 148 So. 3d 1094, 1150 [(Ala. Crim. App. 2013)]. Alabama has recognized few instances where the prejudice prong of the Strickland analysis is presumed without proof. Hunt v. State, 940 So. 2d 1041, 1056 (Ala. Crim. App. 2005). Moreover, it should also be noted that [Byrd] considered and declined a plea offer to life without the possibility of parole during plea discussions prior to trial."

31

(C. 82-83.)

Regarding a claim of a "constructive denial" of counsel under Cronic, this Court has stated:

"The United States Supreme Court in Cronic held that prejudice is presumed when a defendant 'is denied counsel at a critical stage of his trial.' 466 U.S. at 659, 104 S. Ct. 2039. However, this exception has been narrowly applied.

"'[T]he Cronic exception is exceedingly narrow, see Florida v. Nixon, 543 U.S. 175, 190, 125 S. Ct. 551, 160 L.Ed.2d 565 (2004), and applies where the defendant has demonstrated that "the attorney's failure [was] complete," Bell v. Cone, 535 U.S. 685, 696-97, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). In other words, "the circumstances leading to counsel's ineffectiveness [must be] so egregious that the defendant was in effect denied any meaningful assistance at all." United States v. Griffin, 324 F.3d 330, 364 (5th Cir. 2003) (citation omitted).

"'The Cronic exception has been applied in cases where counsel slept as evidence was being introduced against the defendant, Burdine v. Johnson, 262 F.3d 336, 338 (5th Cir. 2001) (en banc), where counsel adopted and acted upon a belief that his client should be convicted, Osborn v. Shillinger, 861 F.2d 612, 625 (10th Cir. 1988), and where counsel sat silently throughout the entire trial, see Harding v. Davis, 878 F.2d 1341, 1345 (11th Cir. 1989). But it has been held inapplicable to cases involving "bad lawyering, regardless of how bad." Scarpa [v. Dubois], 38 F.3d [1] at 13 [(1st Cir. 1994)] (citation omitted). "Attorney error, even when egregious, ... almost always require[s]

32

> analysis under <u>Strickland</u>'s prejudice prong." <u>Id.</u> at 14.'

"<u>United States v. Theodore</u>, 468 F.3d 52, 56 (1st Cir. 2006)."

<u>State v. Lewis</u>, 371 So. 3d 863, 887 (Ala. Crim. App. 2022).

The circuit court did not err in finding this claim inadequately pleaded. Byrd's allegations focus on two issues—his <u>Atkins</u> claim and a plea deal, which he rejected. But even assuming that counsel—as Byrd asserts—did "nothing" during the four months at issue, this case does not support applying the narrow exception recognized in <u>Cronic</u>. <u>See</u> <u>Lewis</u>, <u>supra</u>. Thus, Byrd had to plead facts to show that he was prejudiced by counsel's alleged ineffectiveness. He did not do so. His assertion that, if his attorneys had done more earlier, the result of the proceedings would have been different is no more than a bare allegation.

Byrd is due no relief on this claim. <u>See</u> Rule 32.7(d), Ala. R. Crim. P.

## IV. INEFFECTIVE ASSISTANCE IN JURY SELECTION

Byrd asserted in his petition many ineffective-assistance-of-counsel claims related to jury selection. On appeal, Byrd summarizes those claims as "trial counsel failed to take reasonable steps to shape the jury that would sit in judgment of [Byrd]," which, he says, included (1) not

"consider[ing] the effects of pre-trial publicity on the venire"; (2) not considering "the venire's racial composition"; (3) failing "to check for bias of potential jurors"; and (4) not "effectively challeng[ing] the State's use of peremptory challenges to eliminate women and African-Americans." (Byrd's brief, p. 53.)

Byrd begins his argument in this part of his brief with two one-sentence assertions of error. (Byrd's brief, p. 54.) He first argues that the circuit court "ignored binding Eleventh Circuit precedent, United States v. Tuttle, 729 F.2d 1325, 1327 (11th Circ. 1984), in rejecting Byrd's argument that racial disparities in the jury venire provided a basis for trial counsel to pursue a claim under Duren v. Missouri, 439 U.S. 357 (1979)." He follows that sentence by stating: "And it did not meaningfully engage with Byrd's argument that trial counsel should have questioned the juror during voir dire regarding biases related to race and Byrd's intellectual disability." Neither assertion complies with Rule 28(a)(10), Ala. R. App. P., and we will not address them. See Woodward, 276 So. 3d at 746; C.B.D. v. State, 90 So. 3d 227, 239 (Ala. Crim. App. 2011) ("'[W]e are not required to consider matters on appeal unless they are presented and argued in brief with citations to relevant legal authority.' Zasadil v.

*City of Montgomery*, 594 So. 2d 231, 231 (Ala. Crim. App. 1991). 'When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court's duty nor its function to perform an appellant's legal research.' *City of Birmingham v. Business Realty Inv. Co.*, 722 So. 2d 747, 752 (Ala. 1998). Failure to comply with Rule 28(a)(10) has been deemed a waiver of the issue presented. See, e.g., *Hamm v. State*, 913 So. 2d 460, 486 (Ala. Crim. App. 2002). Therefore, because C.B.D.'s argument in this regard does not comply with Rule 28(a)(10), it is deemed to be waived.").

Byrd next asserts that the circuit court erred in denying his claim based on *Batson v. Kentucky*, 476 U.S. 79 (1986), and *J.E.B. v. Alabama*, 511 U.S. 127 (1994). (Byrd's brief, p. 54.) The circuit court addressed this claim by finding:

> "[Byrd] next alleges that the State used a disproportionate number of its peremptory challenges to strike African Americans and women from the jury and trial counsel did not challenge these strikes as violations of either *Batson v. Kentucky*, 476 U.S. 79, 96 (1986), or *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146 (1994). [Byrd] argues that the State's pattern of strikes raised an inference that they were racially motivated. Although the law is clear that prejudice is presumed in cases where counsel fails to make a *Batson* objection (*Hunt v. State*, 940 So. 2d 1041, 1056-57 (Ala. Crim. App. 2005)), Byrd does little besides plead the numbers and percentages of several classes of potential jurors struck in his

35

petition. The Court of Criminal Appeals has said '[n]umbers alone are not sufficient to establish a prima facie case of discrimination.' Gobble v. State, 104 So. 3d 920, 949 (Ala. Crim. App. 2010) (quoting Blackmon v. State, 7 So. 3d 397 (Ala. Crim. App. 2005)). As [Byrd] concedes, although the venire was just 35.7% African-American, they made up 41.7% of the jury. Moreover, although the venire was 55.4% female, 50% of the jury was female.

"[Byrd's] bare claim that trial counsel could have raised an objection and thus must raise an objection in order to avoid deficient performance is contrary to Alabama law and Eleventh Circuit precedent. Woodward [v. State], 276 So. 3d [713,] 751 [(Ala. Crim. App. 2018)]; see also King v. Sec'y, Dep't of Corr., 793 F. App'x 834, 840 (11th Cir. 2019), cert. denied sub nom., King v. Inch, 141 S. Ct. 303, 208 L. Ed. 2d 55 (2020) (rejecting a challenge to trial counsel's decision not to raise a Batson objection because 'an attorney does not perform incompetently when, as here, she makes a strategic decision that other competent attorneys might have made.') Where, as here, trial counsel must be presumed to have made a reasoned decision not to raise a Batson objection, the mere fact that he did not raise the objection cannot show deficient performance. Moreover, the factual basis of this claim, assuming its truth, would not show deficient performance; at most, [Byrd] raises a potential objection in hindsight. But courts reviewing Strickland claims must avoid the distorting effects of hindsight."

(C. 84-85.)

Byrd focuses on the circuit court's statement that "'[n]umbers alone are not sufficient to establish a prima facie case of discrimination.'" Byrd argues that the circuit court "ignored the specific examples of disparate treatment identified in the petition, as well as case law establishing that

a pattern of peremptory challenges can be 'sufficient to raise suspicions about the prosecution's motives and to call for the prosecution to explain its strikes.'" (Byrd's brief, p. 55 (quoting <u>Davis v. Ayala</u>, 576 U.S. 257, 285 (2015).) He also asserts that the circuit court "ignored the fact that the claim is based on ineffectiveness established by trial counsel's failure to challenge the prosecution's strikes and to make the kind of contemporaneous record necessary to support <u>Batson</u> relief in the first instance." (Byrd's brief, p. 56.) Although he cites authority, we question whether Byrd's brief argument complies with Rule 28(a)(10), Ala. R. App. P.

What's more, Byrd does not address that part of the circuit court's judgment based on the presumption that trial counsel acted reasonably. In <u>Woodward</u>, this Court stated:

> "Generally, '"the failure by counsel in a capital case to raise any particular claim or claims does not per se fall below an objective standard of reasonableness."' <u>Horsley v. State</u>, 527 So. 2d 1355, 1359 (Ala. Crim. App. 1988) (quoting <u>Lindsey v. Smith</u>, 820 F.2d 1137, 1144 (11th Cir. 1987)). In <u>Yelder v. State</u>, 575 So. 2d 137, 139 (Ala. 1991), the Alabama Supreme Court held that 'the failure of trial counsel to make a timely <u>Batson</u> objection to a prima facie case of purposeful discrimination by the State in the jury selection process through its use of peremptory challenges is presumptively prejudicial to a defendant.' However, the 'holding in <u>Yelder</u> does not relieve the defendant of his burden of meeting the

first prong of the Strickland test—a showing of deficient performance by counsel,' Ex parte Frazier, 758 So. 2d 611, 615 (Ala. 1999), and this Court has recognized that the decision whether to make a Batson objection may be a strategic one. In Carruth v. State, 165 So. 3d 627 (Ala. Crim. App. 2014), this Court held that a Rule 32 petitioner had failed to plead sufficient facts in his petition to indicate that counsel had been ineffective for not raising a Batson objection because the petitioner had failed to plead facts indicating that there was a prima facie case of discrimination and had failed to allege that counsel's decision not to make a Batson objection was not sound trial strategy. In doing so, this Court noted that '[c]ounsel could have been completely satisfied with the jury that was selected and not wished to potentially disturb its composition by making a Batson challenge.' Carruth, 165 So. 3d at 639.

"Other jurisdictions have similarly recognized that it is not per se deficient performance for counsel not to make a Batson objection even when there is a prima facie case of discrimination. See, e.g., Flanagan v. State, 712 N.W.2d 602, 609-10 (N.D. 2006); Davis v. State, 123 P.3d 243, 246-47 (Ok. Crim. App. 2005); and Randolph v. Delo, 952 F.2d 243, 246 (8th Cir. 1991). Generally, 'the decision to make or not make a Batson challenge falls within trial counsel's trial strategy and the wide latitude given him, to which appellate courts must defer.' Hall v. State, 735 So. 2d 1124, 1128 (Miss. Ct. App. 1999). We agree, and we hold that counsel's failure to make a Batson objection when there is a prima facie case of discrimination is not per se deficient performance."

276 So. 3d at 751.

As the circuit court stated, "'[n]umbers alone are not sufficient to establish a prima facie case of discrimination.' Gobble v. State, 104 So. 3d 920, 949 (Ala. Crim. App. 2010) (quoting Blackmon v. State, 7 So. 3d

38

397 (Ala. Crim. App. 2005))." Although Byrd cited four specific prospective jurors as examples of the prosecutor's allegedly disparate treatment of prospective jurors, his allegations do not overcome the presumption that trial counsel's failure to object was not sound trial strategy. See Carruth v. State, 165 So. 3d 627, 639 (Ala. Crim. App. 2014).[7]

Byrd has not shown that the circuit court erred in finding his claim insufficiently pleaded. He is due no relief on this issue.

## V. PLEA NEGOTIATIONS

In his petition, Byrd asserted ineffectiveness claims related to an alleged offer from the State of a sentence of life imprisonment without the possibility of parole ("LWOP"). Byrd summarizes this claim in his brief on appeal:

> "[T]rial counsel failed to provide Roderick Byrd with effective assistance with respect to a plea, including by failing to advise him from the outset of the necessity of a disposition by plea, failing to pursue a plea[,] and, when the prosecution made an

---

[7]In Carruth, this Court noted that the record showed that Carruth's trial counsel "affirmatively stated that they did not have any [Batson or J.E.B.] challenges." 165 So. 3d at 639. Byrd's trial counsel did not affirmatively state that they had no challenges under Batson or J.E.B. But despite having expressed Batson concerns at an earlier point in the proceeding, trial counsel raised no objection to the jury after the parties exercised their peremptory strikes. (See Trial R. 312, 515.)

LWOP plea offer shortly before trial, failing to advise him adequately with respect to that offer. ... [B]ut for trial counsel's deficient performance, [Byrd] would have accepted the plea offer, pleaded guilty[,] and received an LWOP sentence. ... Trial counsel's ineffectiveness was compounded by Byrd's intellectual disability: despite having some evidence of [Byrd's] limitations, trial counsel took no steps to ensure that he would comprehend the consequences of a decision to reject a plea offer."

(Byrd's brief, pp. 56-57.) Byrd alleged in his petition that "in April 2007 ... the prosecution conveyed to trial counsel an oral plea offer that included an LWOP sentence." (C. 226.) Byrd asserted that "trial counsel did not even discuss a plea deal with Mr. Byrd until his trial was set to begin—ten months after the State indicated that [it] would consider such a deal."[8] (C. 226 (emphasis added).) Byrd asserted that trial counsel initially mentioned the alleged April 2007 plea offer only to Byrd's aunt, LaTonja McDonald. (C. 226.) But Byrd asserted that,

"[o]n the morning that the trial was set to begin, trial counsel met with Mr. Byrd in a room adjacent to the courtroom to discuss the plea offer. Trial counsel asked Ms. McDonald to join them presumably on the theory that she could assist them in explaining the compelling case for pleading guilty in

---

[8]Byrd asserted in his petition that trial counsel "should have explored plea options from the outset of their representation" but did not do so. (C. 226.) Byrd's trial was in June 2007. If, as Byrd alleges in his petition, counsel waited until June 2007 to talk to Byrd about a plea deal, then trial counsel and the State were in fact in discussions about the possibility of plea deal within months of Byrd's indictment in May 2006.

exchange for a guaranteed sentence of LWOP. Trial counsel knew that Mr. Byrd had said in his statement to the police and had told his family that he didn't shoot anyone and that Mr. Mitchell had shot all three victims. Based on this, Mr. Byrd mistakenly believed that he could not be convicted of capital murder. After trial counsel described the plea offer, Ms. McDonald indicated to Mr. Byrd that if he did not shoot anyone, he should go to trial rather than take the plea offer. She said that if she were in his position, she would go to trial. Hearing that, Mr. Byrd rejected the plea as instructed. Mr. Byrd, Ms. McDonald, and trial counsel will testify to these facts."

(C. 227.) Byrd asserted that, "[d]espite their awareness of Mr. Byrd's severe intellectual deficits, trial counsel did nothing to ensure that Mr. Byrd understood that he could be convicted for capital murder even as a non-shooter" and did not "ensure that Mr. Byrd comprehended that he could be convicted of capital murder and sentenced to death as an accomplice even if he did not shoot anyone." (C. 228 (emphasis added).) Byrd asserted that trial counsel did not take more time to meet with Byrd alone and "explain to Mr. Byrd that the State had ballistics evidence to support their theory that there were two shooters … and that trial counsel had no rebuttal to that ballistics evidence." (C. 228.) Byrd asserted that McDonald would testify that, if trial counsel had explained that pleading guilty to capital murder would not necessarily mean that Byrd was admitting to shooting someone, she would have advised Byrd

41

to accept the plea offer and that he would have accepted it. (C. 227-28.)

Byrd asserted that, in discussing the plea offer with him, trial counsel

"failed to account for Mr. Byrd's intellectual disability." (C. 225.) Finally,

Byrd asserted that the circuit court should "order the State to reoffer the

plea deal and resentence Mr. Byrd accordingly." (C. 234.)

The circuit court found this claim inadequately pleaded:

"[Byrd] claims that the proper remedy is for this court to order the State to re-offer the plea deal. [Byrd] asserts that trial counsel failed to discuss a plea offer with [Byrd] when the State indicated its openness to one and thus lost the opportunity to have a reasonable and appropriately thorough discussion with him. There is no basis to order the State to re-offer the plea deal because it is not clear from [Byrd's] petition whether the State ever officially offered [Byrd] a lesser sentence in exchange for pleading guilty. Further, [Byrd] has not plead[ed] specifically that he was not properly advised of the alleged plea offer and his options, and that he would have accepted the plea. Thus, he does not plead the 'full factual basis for [his] claim.' Washington v. State, 95 So. 3d [26,] 59 (Ala. Crim. App. 2012).

"Next, [Byrd] claims that trial counsel failed to explore plea options from the outset, even though they knew or should have known the difficulty of defending [Byrd] in light of the State's overwhelming evidence, including (i) a video of the crime scene showing [Byrd] at the scene and holding a gun; (ii) ballistics evidence indicating that two guns were used to kill the victims; and (iii) [Byrd]'s admission that he had a gun and his equivocation about whether Brandon Mitchell had two guns. [Byrd] alleges that trial counsel were aware of [Byrd's] intellectual disability and limitations, but they failed to take account of those limitations in explaining the plea offer

42

and the risks of trial to allow [Byrd] to understand his situation and act accordingly. This assertion is belied by the record, as the record reflects that [Byrd] is not intellectually disabled. See Byrd, 78 So. 3d at 451 ….

"[Byrd] alleges he was not informed that even if he did not shoot anyone, he likely would still be convicted of capital murder and sentenced to death. In summary, [Byrd] argues that trial counsel did not tell him that the plea offer was as good as and likely better than the best possible outcome of trial. Unfortunately, [Byrd] fails to plead specifically what information trial counsel did convey to him or what his response would have been, or that, armed with this additional information, he would have taken the plea deal. The record indicates that after discussions with trial counsel with a family member present, [Byrd] chose not to take any plea deal. Counsel cannot be held ineffective for the informed and voluntary choices of their client. Moreover, a defendant cannot voluntarily choose a course of action and then blame trial counsel for that course of action. Ferguson v. State, 13 So. 3d 418, 439 (Ala. Crim. App, 2008)."

(C. 86-87.)

On appeal, Byrd argues (1) that the circuit court was "flatly wrong" in finding that the petition did not clearly allege that the State had "'officially offered [Byrd] a lesser sentence in exchange for pleading guilty'"; (2) that the circuit court erred in finding that Byrd did not specifically plead "that he was not properly advised of the alleged plea offer and his options"; and (3) that the circuit court erred in finding "that Byrd had not alleged that if properly advised, 'he would have taken the

43

plea deal.'" (Byrd's brief, pp. 59-61.)

As with other arguments on appeal, Byrd's arguments are mostly restatements of the claims in his petition with no legal authority showing that the circuit court erred. Thus, we question whether this part of Byrd's brief complies with Rule 28(a)(10), Ala. R. App. P.  See Bohannon, 401 So. 3d at 326.

Regardless, Byrd is due no relief on these arguments. Byrd pleaded nothing about the terms of an "official offer" from the State other than the sentence.[9] With no allegations about the terms of the deal, the circuit court could only speculate about whether Byrd, as Byrd asserted in his petition, would not have had to admit to shooting one or more of the victims. Thus, as the circuit court found, Byrd did "not plead the 'full factual basis for [his] claim.' Washington v. State, 95 So. 3d [26,] 59 (Ala. Crim. App. 2012)."

What's more, the circuit court did not err in finding that Byrd had failed to specifically plead that he was not properly advised of the plea offer and his options. The terms of the plea offer—other than the alleged

---

[9]Byrd did not plead, for example, whether the State wanted Byrd to plead guilty to all four counts of capital murder or to some lesser number of counts or to a lesser offense.

sentence—are speculative.

Byrd is due no relief on this issue. See Rule 32.7(d), Ala. R. Crim.

P.

## VI. INEFFECTIVENESS IN CHALLENGING THE ADMISSIBILITY OF HIS STATEMENT TO LAW-ENFORCEMENT OFFICERS

Byrd argues that his trial counsel were ineffective in challenging

the admissibility of his statement to law-enforcement officers. (Byrd's

brief, p. 62.)

On direct appeal, this Court held that there was no error, plain or

otherwise, in the admission of Byrd's statement:

> "Byrd next argues that the circuit court erroneously allowed the State to introduce into evidence a statement he gave to law-enforcement officers. Specifically, Byrd argues that due to his mental deficiencies (i.e., his alleged mental retardation and/or his low IQ), he was incapable of knowingly waiving his Miranda [v. Arizona, 384 U.S. 436 (1966),] rights. Byrd bases his argument on his school records and Dr. Ackerson's testimony that his low IQ could have affected his ability to understand his Miranda rights. The State asserts that Byrd's argument is without merit because Byrd is not mentally retarded and because the totality of the circumstances establishes that his waiver of his Miranda rights was knowing and voluntary. We agree.
>
> "'It has long been the law that a confession is prima facie involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate.' Waldrop v. State, 859 So. 2d 1138, 1155 (Ala. Crim. App. 2000) (citing

Jackson v. State, 562 So. 2d 1373, 1380 (Ala. Crim. App. 1990)). 'The trial court's finding that a statement was voluntary need only be supported by a preponderance of the evidence.' Ex parte Jackson, 836 So. 2d 979, 982 (Ala. 2002) (citing Dixon v. State, 588 So. 2d 903 (Ala. 1991)). '"Whether a waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accused—i.e., the totality of the circumstances."' Waldrop, 859 So. 2d at 1156 (quoting Click v. State, 695 So. 2d 209 (Ala. Crim. App. 1996)); see also Ex parte Matthews, 601 So. 2d 52, 54 (Ala. 1992) (holding that a court must analyze the voluntariness of a confession by examining the totality of the circumstances).

"A defendant's low IQ is only one factor that must be considered when reviewing the totality of the circumstances. See Dobyne v. State, 672 So. 2d 1319, 1337 (Ala. Crim. App. 1994); Beckworth v. State, 946 So. 2d 490, 517 (Ala. Crim. App. 2005). 'While an accused's intelligence and literacy are important factors, ... weak intellect or illiteracy alone will not render a confession inadmissible.' Hobbs v. State, 401 So. 2d 276, 282 (Ala. Crim. App. 1981); see also Hodges v. State, 926 So. 2d 1060, 1073 (Ala. Crim. App. 2005) (same); cf. Colorado v. Connelly, 479 U.S. 157, 165, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (holding that mental defects alone are insufficient to establish that a confession was involuntary under the Due Process Clause). As this court stated in Beckworth: '[A] defendant's low IQ does not preclude a finding that a Miranda waiver was voluntary unless the defendant is so mentally impaired that he did not understand his Miranda rights.' 946 So. 2d at 517 (citing Dobyne, 672 So. 2d at 1337); see Moore v. Dugger, 856 F.2d 129, 132 (11th Cir. 1988) (mental deficiencies, in the absence of police coercion, are not sufficient to establish involuntariness, and the fact that the defendant was generally calm and responsive during interrogation, that he did not appear confused, and that he understood the questions put to him established a valid

waiver of <u>Miranda</u> rights, despite the defendant's low IQ).

"Contrary to Byrd's assertions, Dr. Ackerson's testimony that his low IQ could have affected his ability to understand his rights is insufficient to show that he was 'so mentally impaired that he [in fact] did not understand his <u>Miranda</u> rights.' <u>Beckworth</u>, 946 So. 2d at 517 (citing <u>Dobyne</u>, 672 So. 2d at 1337). Dr. Ackerson did not testify that Byrd's low IQ rendered him incapable of understanding his rights; instead, she merely stated that Byrd's low IQ could have affected his understanding of his rights. Without more, this testimony is insufficient to preclude a finding that Byrd knowingly and voluntarily waived those rights.

"Moreover, this court's review of the record and of Byrd's statement convinces us that Byrd did, in fact, understand his rights and that he knowingly waived them. Prior to Byrd's statement, law-enforcement officers identified themselves and clearly informed Byrd of his <u>Miranda</u> rights. (R. 84; C.R. 247.) Detective Cynthia Morrow testified that Byrd, after being read his <u>Miranda</u> rights, stated that he understood his rights and that he voluntarily chose to waive those rights. (R. 84-90.) Detective Morrow further testified that Byrd was not threatened or coerced in any manner. <u>Id.</u>

"Detective Morrow's testimony is corroborated by Byrd's tape-recorded statement and a waiver-of-rights form that he signed. Prior to any questioning, Byrd clearly and articulately read aloud and then signed the statement on the waiver-of-rights form acknowledging, among other things, that: 1) he had been informed of and understood his rights; 2) he voluntarily chose to speak with law-enforcement officers; and 3) no force, threats, or promises had been used to induce him to waive his rights. (C.R. 247.) During the interview, Byrd was calm, responsive, and did not appear confused. His answers to the questions posed establishes that he understood those questions. The fact that Byrd altered his statement when he was confronted with evidence indicating that he was not being

47

truthful establishes that he was lucid and thinking about his responses. Finally, the fact that Byrd required the officers to take a break and that he eventually invoked his right to remain silent establishes that he understood his Miranda rights and understood that he could invoke those rights at any time. See United States v. Dryden, 567 F. Supp. 2d 643, 653 (D. Del. 2008) (holding that a defendant's invocation of his rights establishes that he understood those rights).

"Based on the foregoing, this court is convinced that Byrd knowingly and voluntarily waived his Miranda rights and that his mental deficiencies did not invalidate that waiver. Consequently, the circuit court correctly allowed Byrd's statement to be introduced into evidence."

Byrd, 78 So. 3d at 453-54 (footnotes omitted).

In the part of his brief on this issue, Byrd offers a condensed version of the allegations he made in his petition, in which (1) he challenged this Court's holding on direct appeal that his statement was properly admitted into evidence and (2) alleged that, if trial counsel had conducted more investigation into Byrd's "intellectual limitations," counsel could have shown that Byrd's statement was involuntary because, Byrd asserted, he lacked the comprehension skills to understand his Miranda rights. (C. 235-68.)

In rejecting this claim, the circuit court found:

"[Byrd] alleges that Trial Counsel were ineffective in not developing and presenting evidence supported by experts that his intellectual limitations made any waiver of his Miranda

48

rights invalid and his subsequent statements to investigators inadmissible. In a statement made following Miranda warnings, [Byrd] admitted that he had participated in the Airport Inn robbery and had carried a gun. [Byrd's] statement was central to the State's argument for a capital murder conviction and a death sentence. [Byrd] argues that he was unable to understand a Miranda warning and Dr. Kathleen Fahey, an expert in speech-language pathology, who was available to testify at the time of trial, would have testified that in her professional opinion, [Byrd] lacked comprehension skills to understand the warnings given and could not have knowingly waived his rights.

"[Byrd] further argues that his ability to waive his Miranda rights was also affected by his demonstrated below-average intellectual functioning. Dr. George Woods, a neuropsychiatrist who was available to testify at the time of trial, would have testified that [Byrd] has an intellectual disability and a neurodevelopmental disorder, each of which increased his susceptibility to deception and negatively affected the voluntariness of his statement and his ability to terminate questioning. Trial counsel did not investigate [Byrd's] intellectual limitations or vulnerabilities until a few days before trial and never considered, strategically or otherwise, their relevance to his waiver of Miranda rights. [Byrd] asserts that had trial counsel (a) met prevailing professional standards in investigating and developing evidence of Mr. Byrd's intellectual limitations; (b) engaged expert assistance with respect to such evidence; and (c) presented such evidence and supportive expert testimony, there is a reasonable probability that Mr. Byrd's statement would have been excluded and the outcome at trial would have been different.

"[Byrd's] claim lacks merit as argued by the State because the Court of Criminal Appeals correctly found, [Byrd] is not intellectually disabled. See Byrd, 78 So. 3d at 542 .... This claim is also meritless because the Court of Criminal

49

Appeals addressed the admissibility of Byrd's statement on direct appeal and held that it was correctly admitted. Trial counsel cannot be held ineffective for failing to raise meritless issues nor failing to make a challenge that has no basis in fact or law. Magwood v. State, 689 So. 2d 959, 979-81 (Ala. Crim. App. 1996). The Court of Criminal Appeals was convinced that Byrd knowingly and voluntarily waived his Miranda rights and that his mental deficiencies did not invalidate that waiver. Consequently, the circuit court correctly allowed Byrd's statement to be introduced into evidence. Byrd, 78 So. 3d at 453-55 ...."

(C. 87-88.) On appeal, Byrd's only specific assertion of error is his concluding paragraph in this part of his brief:

"As a result of trial counsel's ineffectiveness, the trial record did not include the available evidence regarding Byrd's intellectual limitations and comprehension skills nor a challenge to the admissibility of his statement on the basis of such evidence. The ruling on direct appeal regarding the admissibility of Byrd's statement thus could not and did not account for evidence of his intellectual limitations that did not appear in the record because of the ineffective assistance of counsel. Thus, the Trial Court's determination does not create a bar to Rule 32 consideration of this claim."

(Byrd's brief, p. 65.) Other than citations to his petition, Byrd cites no authority in support of this assertion. This fails to satisfy Rule 28(a)(10), Ala. R. App. P. See Bohannon, supra. Byrd is due no relief on this issue.

## VII. CLAIMS ASSERTING INEFFECTIVENESS DURING THE GUILT PHASE

In this part of his brief, Byrd summarizes some of the allegations

he made in Claim VII of his petition, in which he asserted that his trial counsel provided ineffective assistance during the guilt phase based on (1) "trial counsel's failures to investigate the crime scene and challenge the trial video"; (2) "trial counsel's failure to investigate and challenge the State's ballistics evidence"; and (3) "trial counsel's failure to investigate and introduce evidence concerning Byrd's lack of specific intent." (Byrd's brief, pp. 65-75.) Byrd asserts that, because of those "investigatory failures," trial counsel "were fundamentally unprepared for trial." (Byrd's brief, p. 75.) He states that, if counsel had "conducted a reasonable investigation in support of their defense theory and developed the evidence available to support it at trial, they would have improved their bargaining position and had at least a chance of obtaining a felony murder conviction." (Byrd's brief, p. 75.)

In summarily dismissing this claim, the circuit court stated:

"In Claim VII, [Byrd] alleges that trial counsel provided ineffective assistance by failing to investigate and present evidence necessary to their chosen defense strategy. [Byrd] argues a laundry list of things trial counsel should have done to promote their defense strategy. In summary, trial counsel had to: (1) undermine the State's surveillance video evidence; (2) challenge the State's evidence regarding the firearm used to kill Mr. Aylesworth; and (3) present evidence relevant to Mr. Byrd's lack of specific intent. Per [Byrd], … trial counsel had a duty to investigate all plausible lines of defense and, in

51

particular, those necessary to their chosen trial strategy. E.g., Dill v. State, 484 So. 2d 491, 497 (Ala. Crim. App. 1985); State v. Smith, 85 So. 3d 1063, 1080-82 (Ala. Crim. App. 2010). [Byrd] argues that had trial counsel provided effective assistance, there is a reasonable probability of different outcomes both as to guilt and as to penalty.

"The State argues that [Byrd's] assertions that trial counsel had a duty to 'investigate thoroughly each and every possible avenue of defense' is plainly wrong. Instead, 'no absolute duty exists to investigate particular facts or a certain line of defense.' Chandler v. United States, 218 F.3d 1305, 1317 (11th Cir. 2000). 'Investigation (even a non-exhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly.' Id. at 1318 …. Strickland requires that counsel only make reasonable investigations. Strickland, 466 U.S. at 691 …. [Byrd] has a burden to plead facts showing why each allegedly deficient act by his counsel was 'objectively unreasonable.' Daniel v. State, 86 So. 3d [405,] 438 (Ala. Crim. App. 2011). Further, it is well settled that an attorney can almost always do something more in every case, but the Constitution requires a good deal less than maximum performance by trial counsel. Atkins v. Singletary, 965 F.2d 952, 960 (11th Cir. 1992).

"[Byrd] has failed to allege facts that, if true, would establish deficient performance or prejudice. Thus, he does not plead the 'full factual basis for [his] claim.' Washington v. State, 95 So. 3d [26,] 59 [(Ala. Crim. App. 2012)] …. Instead, [Byrd] cites what could have or should have been done by trial counsel and what the possible outcomes would be, which amounts to mere speculation, and speculation is not enough to support a showing of prejudice. Woodward v. State, 276 So. 3d [713,] 786 (Ala. Crim. App. 2018); McMillan v. State, 258 So. 3d [1154,] 1178 (Ala. Crim. App. 2017). The law does not allow [Byrd] to relitigate an issue under the guise of ineffective assistance of counsel. Hunt v. State, 940 So. 2d

1041, 1051-52 (Ala. Crim. App. 2005). Therefore, this claim and each of its subclaims are dismissed as meritless, insufficiently pleaded, or both."

(C. 88-89.)

On appeal, Byrd simply restates some of his allegations from Claim VII and asserts that the circuit court erred. This does not comply with Rule 28(a)(10), Ala. R. App. P. See Bohannon, 401 So. 3d at 326. Byrd is due no relief on this claim.[10]

## VIII. CLAIMS ASSERTING INEFFECTIVENESS DURING THE PENALTY AND SENTENCING PHASES

In this part of his brief, Byrd reiterates some of the allegations he made in Claims VIII and IX of his petition in which he asserted that his

---

[10]Among the many allegations of ineffective assistance that Byrd asserted were claims that trial counsel should have "retain[ed] appropriate experts." (C. 270.) Byrd asserted that trial counsel should have hired or called several unnamed experts, including a "competent firearms expert" (C. 287); an "expert to present a blood spatter analysis on the crime scene photographs" (C. 304); an expert to testify about "the relative positions of the shooter and the victims at the time of the shooting[s]" (C. 301); and "a crime reconstruction expert" (C. 314). Byrd's failure to identify specific experts who were available and willing to testify renders these claims insufficiently pleaded. See, e.g., Thompson v. State, 310 So. 3d 850, 870 (Ala. Crim. App. 2018) ("Thompson failed to plead that Dr. Oral was available and that she could have testified as an expert witness in Alabama in 2005. Thus, Thompson failed to plead the 'full facts' in regard to this claim. See Rule 32.6(b), Ala. R. Crim. P."); see also Brooks v. State, 340 So. 3d 410, 437 (Ala. Crim. App. 2020).

trial counsel provided ineffective assistance during the penalty and sentencing phases of his trial. (Byrd's brief, pp. 76-97.) The circuit court summarized Byrd's claims:

> "In Claims VIII and IX, [Byrd] alleges that trial counsel failed to provide effective assistance in investigating and preparing a mitigation case for presentation to the jury in the penalty phase (Claim VIII) or to the court at sentencing (Claim IX). Under 'prevailing professional norms' as defined by Strickland, counsel in a capital case must conduct an investigation of mitigation evidence in order to provide effective assistance. Wiggins v. Smith, 539 U.S. 510, 523 (2003); Williams v. Allen, 542 F.3d 1326, 1339 (11th Cir. 2008). [Byrd] alleges that other than perfunctory meetings with [Byrd] and a few family members, and the last-minute discovery of incomplete school records, trial counsel conducted no mitigation investigation. [Byrd] identifies specific documentary evidence, lay witness testimony, and expert witness testimony that were available to trial counsel and that an investigation would have identified. [Byrd] further alleges that such evidence is not simply cumulative and that had trial counsel presented it, there is a reasonable probability that petitioner would not have been sentenced to death.

> "[Byrd] alleges that trial counsel never hired an investigator or mitigation specialist, even though engaging such assistance was the 'professional norm' in capital cases. In August 2006, trial counsel recognized this norm, moving for funds to conduct a Pre-Sentence Investigation ('PSI Motion') 'to present the jury with enough information to insure they will make a reasoned determination of whether [Byrd] should be sentenced to death.' They stated further that '[s]uch investigations are customarily and necessarily conducted by individuals with specialized training in the social sciences.' The PSI Motion was granted on behalf of

54

[Byrd] on October 20, 2006, but no investigator or mitigation specialist was ever retained. [Byrd] contends that there was considerable evidence that a reasonable investigation undertaken with the help of appropriate experts and available witnesses would have been able to develop a compelling mitigation case."

(C. 90.) In summarily dismissing the claims as insufficiently pleaded, the circuit court stated:

"Assuming the facts pleaded as true, [Byrd] cannot establish that counsel performed below professional norms or a reasonable probability that he would have been sentenced to life without the possibility of parole had counsel presented additional mitigating evidence. As the United States Supreme Court stated:

"'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'

"Strickland v. Washington, 466 U.S. at 690-91 .... '[T]rial counsel is afforded broad authority in determining what evidence will be offered in mitigation.' McWhorter v. State, 142 So. 3d [1195,] 1246 (Ala. Crim. App. 2011) (citation

55

omitted)."

(C. 91.)

Byrd argues on appeal that "[t]he circuit court dismissed [his] penalty and sentencing phase claims based on the fiction that trial counsel's failures were strategic choices." (Byrd's brief, p. 76.) Byrd asserts that "[t]his holding ignores the detailed allegations of the petition and binding Supreme Court precedent. See, e.g., Wiggins [v. Smith], 539 U.S. [510,] 524 [(2003)]." (Byrd's brief, p. 76.) Byrd asserts that trial counsel's investigation was so inadequate that "there were no 'choices' that can be characterized as strategic or otherwise protected from challenge." (Byrd's brief, p. 77 (quoting McWhorter v. State, 142 So. 3d 1195, 1246 (Ala. Crim. App. 2011).) Byrd also asserts that the circuit court "necessarily and improperly rejected facts that it was required to accept as true." (Byrd's brief, p. 77.)

We question whether Byrd's summary arguments on appeal comply with Rule 28(a)(10), Ala. R. App. P. Regardless, we agree with the circuit court's finding that, under the deferential Strickland standard, Byrd did not plead facts showing that counsel's decisions were not a matter of sound trial strategy. See, e.g., Stanley v. State, 335 So. 3d 1, 50 (Ala.

Crim. App. 2020). We also agree that Byrd did not plead facts showing that his counsel's decisions prejudiced him.

In <u>Stanley</u>, the circuit court summarily dismissed Stanley's claim "that his trial counsel were ineffective for not adequately investigating and presenting mitigating evidence at the penalty phase of the trial and at the sentencing hearing before the trial court." 335 So. 3d at 54-55. Addressing Stanley's claim on appeal, this Court stated:

> "'"[T]rial counsel's failure to investigate the possibility of mitigating evidence [at all] is, per se, deficient performance." <u>Ex parte Land</u>, 775 So. 2d 847, 853 (Ala. 2000), overruled on other grounds, <u>State v. Martin</u>, 69 So. 3d 94 (Ala. 2011). However, "counsel is not necessarily ineffective simply because he does not present all possible mitigating evidence." <u>Pierce v. State</u>, 851 So. 2d 558, 578 (Ala. Crim. App. 1999), rev'd on other grounds, 851 So. 2d 606 (Ala. 2000). When the record reflects that counsel presented mitigating evidence during the penalty phase of the trial, as here, the question becomes whether counsel's mitigation investigation and counsel's decisions regarding the presentation of mitigating evidence were reasonable.
>
> > "'"'[B]efore we can assess the reasonableness of counsel's investigatory efforts, we must first determine the nature and extent of the investigation that took place. ...' <u>Lewis v. Horn</u>, 581 F.3d 92, 115 (3d Cir. 2009). Thus, '[a]lthough [the] claim is

57

that his trial counsel should have done something more, we [must] first look at what the lawyer did in fact.' Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir. 2000)."

"'Broadnax [v. State], 130 So. 3d [1232,] 1248 [(Ala. Crim. App. 2013)] ....'

"Reeves v. State, 226 So. 3d 711, 751 (Ala. Crim. App. 2016).

"As this Court explained in Woodward v. State, 276 So. 3d 713 (Ala. Crim. App. 2018):

"'Whether trial counsel were ineffective for not adequately investigating and presenting mitigating evidence "'turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented.'" McMillan v. State, 258 So. 3d 1154, 1168 (Ala. Crim. App. 2017) (quoting Commonwealth v. Simpson, 620 Pa. 60, 100, 66 A.3d 253, 277 (2013)).

"'"'[W]hen, as here, counsel has presented a meaningful concept of mitigation, the existence of alternate or additional mitigation theories does not establish ineffective assistance.' State v. Combs, 100 Ohio App. 3d 90, 105, 652 N.E.2d 205, 214 (1994). 'Most capital appeals include an allegation that additional witnesses could have been called. However, the standard of review on appeal is deficient performance plus prejudice.' Malone v. State, 168 P.3d 185, 234-35 (Okla.

Crim. App. 2007)."

"'State v. Gissendanner, 288 So. 3d 923, 965 (Ala. Crim. App. 2015)[, rev'd on other grounds, Ex parte Gissendanner, 288 So. 3d 1011 (Ala. 2019)]. "[C]ounsel does not necessarily render ineffective assistance simply because he does not present all possible mitigating evidence." Williams v. State, 783 So. 2d 108, 117 (Ala. Crim. App. 2000), overruled on other grounds by Ex parte Taylor, 10 So. 3d 1075 (Ala. 2005).

"'... "[W]hen a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer— including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland v. Washington, 466 U.S. 668, 695, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "To assess that probability, we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" Porter v. McCollum, 558 U.S. 30, 41, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009) (quoting Williams v. Taylor, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). We "'must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied.'" McWhorter v. State, 142 So. 3d 1195, 1231 (Ala. Crim. App. 2011) (quoting Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999)).'

"276 So. 3d at 773-74."

Stanley, 335 So. 3d at 55-56.

The record from Byrd's direct appeal shows that, at the penalty phase, trial counsel presented three witnesses—Dr. Ackerson, Byrd's aunt LaTonja McDonald, and Byrd. Dr. Ackerson testified that she had reviewed records pertaining to Byrd. Those records

> "included some psychological evaluations that were conducted with Mr. Byrd previously. And these were under the auspice of his school records. And the testing that was conducted consisted of intellectual assessments, academic achievement assessment. Also, some adaptive behavioral scales were conducted to discern behavioral problems, and also some other issues related to psychopathology and so forth. Also, there were other—there's something entitled the Birmingham High School Cumulative Record that was received, and also some other results of some standardized achievement testing that all students are given."

(Trial R. 1087-88.) Dr. Ackerson testified that she had reviewed the records and had evaluated Byrd. She testified that Byrd had received "special educational services" while in school. She testified that IQ testing of Byrd when he was 14 years old showed an overall IQ of 65, which, she said, was "a classification of extremely low" and was classified as "mild mental retardation." (Trial R. 1088-89.) She testified that a second IQ test, given when Byrd was 17 years old, showed a full-scale IQ of 75—"[a]nd that particular score would be classified as borderline,

which is … the next step up from the extremely low level." (Trial R. 1089.)

Dr. Ackerson testified that, just before trial, she had administered an IQ test to Byrd—the same test given to him when he was 17 years old—and that his full-scale IQ was 72. Consistent with her testimony at the Atkins hearing, Dr. Ackerson testified about the "margin of error" with the IQ tests and about the range for each of the testing results. (Trial R. 1090.) Dr. Ackerson testified that the margin of error for Byrd's testing results at age 17 and just before trial were within the "mental retardation range." (Trial R. 1091.)

When asked about whether she had been "able to make a determination as to what may [have] contribute[d] to Mr. Byrd's intellectual functioning," Dr. Ackerson testified that "Mr. Byrd discussed" with her his background:

> "One of the things that he informed me is that he was a twin. And he was also the second born of the twin. And sometimes in twin births, one of the children may be compromised, because a twin birth—any multiple birth can be difficult and is at a higher risk for complication. A second born of a twin tends to have, if there's going to be any complication, often there will be some complication. So right off I found out that even perhaps in utero he may have had some problems.
>
> "I then was briefly informed—I confirmed something with a family member that, No. 1, that he was a twin. And this family member happened to be the other twin. And he

61

informed me that his brother did suffer complications at the time of birth.

"The other thing was consistent with perhaps some type of birth trauma. Mr. Byrd himself described himself as being a very hyper kid. And that is something that you will sometimes see with children who have complications at birth or in utero. It's that they might have attentional, and some hyperactivity problems, with impulse control. And he indicated that he was placed on some medications. In that regard, that is another sign to me that would help explain why his IQ was low. A child with attentional hyperactivity problems often suffers in school. They can have a lot of problems, and consequently, cannot learn as well. And that may also [have] contribute[d]."

(Trial R. 1091-92.) Dr. Ackerson also testified about learning that Byrd's

mother had been murdered:

"Q. Did you find any other reasons why he perhaps may have scored so low [on his IQ test in the seventh grade]? Were there any other contributors that you found?

"A. Yes. When he was, I believe it was nine years of age, in 1994, his mother was murdered. And he witnessed this murder. He was there when she was killed. Apparently, it stemmed over an argument with a neighbor. And his mother was unexpectedly killed. Anytime that a child experiences a trauma, especially if it's something to that level, before the age of nine, that can impact brain development, because your brain is not completely developed at that time. So any type of significant trauma—and this certainly would constitute significant trauma—could have also impacted on his brain development, such that his intellectual functioning is, and remains low.

"Q. So is it fair to say with the disadvantages that Mr.

62

Byrd already exhibited, that this additional trauma may have exacerbated and just caused him more problems?

"A. It could very well have, yes."

(Trial R. 1092-93.) Dr. Ackerson testified that "somebody with a 72 IQ" would not "likely … be a leader, especially if it's complex behavior." (Trial R. 1096.) She opined:

"People with 72 IQs are likely going to have problems within the social arena having trouble understanding things sometimes within the social situation, also within, you know, intellectual situations, such as school. So I think that they are more likely to be a follower."

(Trial R. 1096-97.)

On cross-examination, Dr. Ackerson admitted that the range of results for the IQ tests could "be higher" than the full-scale result. She acknowledged that missing 34 days of school—as the school records showed for Byrd during the 11th grade—"absolutely" could have affected his "ability to learn." (Trial R. 1094, 1099.) She noted that, although she could not determine which courses were "special education" or "regular" courses, Byrd had received a 91 in science, an 85 in English, and a 91 in social studies, as well as some bad grades. (Trial R. 1098.) Dr. Ackerson also testified that she did not think that Byrd "was malingering" during the IQ test she had administered to him. (Trial R. 1097.)

63

McDonald testified that Byrd was her nephew—the son of her older sister—and that she had "raised [him] after his mother was killed." (Trial R. 1101.) McDonald testified about when her sister was killed:

"On August the 31st, 1994, I received a call from my mother, crying, and she asked me to come to her home. And she said, 'Come quick, come quick, a lady just killed your sister.' And it was hard for me to believe, because I had just— they had just left my house. So when I got there, it was raining very hard, so hard you couldn't see. People everywhere. It was just unreal.

"Q. Where was Roderick?

"A. When I got there the children were standing outside in the rain, holding each other. It was the smallest that was— because I had the older one with me. And they were holding each other, crying, saying, 'Don't let them take us, Auntie. Don't let them take us.' And I stated, 'Who—who trying to take y'all? Just don't let them take us.' I say, 'I got y'all. Don't worry.'

"Q. Now, how old was Roderick at that time?

"A. He was eight, getting ready to turn nine, because his birthday is in September.

"Q. Okay. Now, he has a twin brother?

"A. Yes.

"Q. Okay. And how long did Roderick live with you?

"A. Roderick lived with me from 1994 up until he became 17."

(Trial R. 1101-02.) McDonald testified that Byrd was not

> "a good student, because he couldn't function at a normal level. He couldn't do what normal children his age could do. He couldn't comprehend. So in seeing that, I went to the school and asked them to test Roderick and his brother.
>
> "....
>
> "... They ran several tests on them. And in the process of that, they came up and they called me in and said, Ms. McDonald, we find that Roderick and Ronald are mentally retarded, which means they have a learning disability. They can't learn at the level that kids normally their age. Also, they put them in counseling through the school, because they were dealing with a lot of nightmares and hurt and pain from witnessing their mother's death. And I also had them in counseling and we went as a family, because it hurt all of us. It affected everybody."

(Trial R. 1102-03.)

McDonald asked the jury to spare Byrd's life:

"I'm asking that you all give Roderick life without parole because Roderick is not a leader. He can't—he's not capable of this. He can't function on something like this. He's not capable. And I'm asking you to please consider that, please.

> "Q. You do understand that three people were killed, don't you?
>
> "A. Yes, I do. And I have—my deepest sympathy go to the family. Because I know what everybody's out here feeling, because I felt this and I'm feeling it now. Because it all happened in this same courtroom. So I know. I have been on both sides. I know what it feel like."

(Trial R. 1104.)

Byrd testified that he had a son who was "[t]hree-and-a-half years old." (Trial R. 1106.) When asked about why the jury should spare his life, Byrd testified:

> "Because I never intended for anyone to get killed on Thanksgiving Day. And I truly am sorry to the victims' families, for their loved ones. Because I know—I know what they're going through right now. And I ask that they spare my life. Because if there was any thought in my mind that Brandon Mitchell was going to kill them people, I would have never went with him.
>
> "Q. Okay. All right. You do realize that you were wrong for going into that hotel? You understand that?
>
> "A. Yes, sir.
>
> "Q. And you understand that three lives were taken because you went in there?
>
> "A. Yes, sir.
>
> "Q. And you're asking this jury for life without parole?
>
> "A. Yes, sir."

(Trial R. 1106.)

In closing argument to the jury, defense counsel acknowledged that the case—hearing the evidence, including testimony from the victims' families, from Byrd, and from Byrd's family—had been "tough ... to sit

66

through." (Trial R. 1113.) Counsel then stated:

"I thought a little bit about something I was looking at not too long ago in making the process of bricks. You know, the bricks they put around houses? And they go through this process where they get the proper ingredients. They get the sand and the mud and the water and the heat. And they have a mold. And they put these ingredients in this mold and heat it up and then we come out with these bricks. And through this process, some of these bricks come out perfect and some come out not so perfect. I submit to you, ladies and gentlemen, that Roderick Byrd is like one of these not-so-perfect bricks.

"He had complications early in life. He's had some intellectual functioning problems as a result of these early complications. We've heard testimony that he's had IQ levels—full scale IQ levels—that were in the mental retardation range as early as the seventh grade. Some of his problems may have been exacerbated by Roderick witnessing his own mother's death. He's one of these bricks that's not so perfect.

"And what do we do when they put all these bricks together? They put them all in these big bundles and ship them to the site where they prepare to brick homes or buildings or businesses. And they take the bricks and they put the perfect bricks on the outside of the house, don't they, so everybody can see them? Do they throw the imperfect bricks away? Do they destroy them? No. They use those and they place those on the inside of the houses that are being bricked so nobody can see them. So nobody can ever see them. But they have the perfect bricks facing on the outside so the world can see.

"So what we're asking you to do, ladies and gentlemen, is to consider Roderick to be like one of those imperfect bricks. Just put him on the back side of the house behind, you know, the perfect bricks so nobody will ever see him again. He'll be

67

in an 8 by 8, or a 10 by 8 by 10 cell, whatever it is. And the world will never ever be able to see Roderick again.

"Roderick is a 23-year-old man with some intellectual functioning problems. We've heard testimony that his IQ level is low. We've heard testimony that—again, that he experienced his own mother's death. And I want you to think about that. I think this is why we heard through testimony, through evidence earlier in the trial Roderick was shaking and crying. I'm sure that brought him back to the time that he witnessed his mother being shot. And this would make me think—it ought to make you think that Roderick could never shoot anybody. He made a bad decision one morning. Instead of getting up, going to work, he made a foolish decision to ride with Brandon Mitchell and Jonathan Floyd.

"The judge read an instruction to you earlier during the guilt phase of the trial. Roderick has no prior criminal history. He made one bad, foolish decision here. He got up and he went with Roderick—with Brandon Mitchell and Jonathan Floyd and a robbery went bad.

"So we ask—you've heard all the evidence. You know this case. We just simply ask that you consider all that you've heard, all that you've learned throughout this trial, all that's been presented to you. And I'm asking you to consider Roderick as one of those bricks that didn't come out perfect. Spare his life and put him away so that he can't ever—so society will never see Roderick Byrd again. That's a sufficient punishment for this decision that he made on Thanksgiving Day in 2005."

(Trial R. 1113-16.)

At his sentencing hearing, Byrd made the following statement to

the court:

68

"Just want to say that I'm sorry for putting my family through this, for putting myself in that predicament and putting my family—taking them through this. And I also want to say I'm sorry to the victims' families. And I ask that God just heal them through their hurt and pain they going through. And I just ask that the Court just have mercy on me right now."

(Trial R. 1162.)

In its order sentencing Byrd to death, the trial court found that three aggravating circumstances existed: (1) that Byrd committed the capital offenses while he "was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit … robbery"; (2) that the capital offenses were "especially heinous, atrocious, or cruel compared to other capital offenses"; and (3) that Byrd "intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct." (Trial C. 33-34.) See § 13A-5-49, Ala. Code 1975.[11] The trial court found that two statutory mitigating circumstances existed: (1) that Byrd had

---

[11]Section 13A-5-49, Ala. Code 1975, has been amended since Byrd committed the offenses, but the relevant subsections are unchanged in the current version of § 13A-5-49. See Act No. 99-403, Ala. Acts 1999; see Minnifield v. State, 941 So. 2d 1000, 1001 (Ala. Crim. App. 2005) ("It is well settled that the law in effect at the time of the commission of the offense controls the prosecution.").

no significant criminal history and (2) that Byrd was only 22 years old when he committed the offenses. (Trial C. 34-36.) See § 13A-5-51, Ala. Code 1975.

The trial court expressly found that several statutory mitigating circumstances did not exist:

> "2. Whether the capital offense was committed while [Byrd] was under the influence of extreme mental or emotional disturbance—No, this mitigating circumstance does not apply. Although [Byrd] has a low IQ, there is no evidence of an extreme mental or emotional disturbance. [Byrd] was able to function well in society and any mental deficiencies he may have had do not appear to have influenced his decision on the date in question. …
>
> "....
>
> "4. Whether [Byrd] was an accomplice in the capital offense committed by another person, and his participation was relatively minor—No, this mitigating circumstance does not apply. Although [Byrd] denied shooting anyone himself, testimony at trial established that Kim Olney and Dorothy Smith were shot with the same gun, and that John Aylesworth was shot with a different gun. Roderick Byrd also admitted in his statement to the police that he was in possession of a gun and that he held the gun on John Aylesworth (who was referred to as the 'white guy'). Other than Byrd's denial that he shot anyone, the evidence indicates that Roderick Byrd shot John Aylesworth and Brandon Mitchell shot Kim Olney and Dorothy Smith. In his statement, Mr. Byrd initially said that Brandon Mitchell had two guns, but he later said that Mitchell only had one gun.
>
> "Even if Byrd did not personally shoot any of the

individuals, his participation was not sufficiently 'minor' to qualify under this section. He went into the hotel with a gun. He admittedly held a gun on at least one victim and forced that person to stay until the robbery was done or until that person, John Aylesworth, had been shot and killed. As the officers indicated while interviewing Byrd, Mr. Aylesworth could have run out and possibly escaped if not for Roderick Byrd. It should be noted that Byrd did not deny this allegation during his interview. Although Brandon Mitchell should be regarded as the central figure in this robbery and homicide, Roderick Byrd also played a primary role.

"5. Whether [Byrd] acted under extreme duress or under the substantial domination of another person—No, this mitigating circumstance does not apply. Although Brandon Mitchell was clearly the leader of the group that committed these offenses, there was no evidence that Roderick Byrd was forced into any actions that he took. He admitted to readily agreeing to commit the robbery. He had his own gun, and there is no evidence that Mitchell or Jonathan Floyd threatened Byrd to stay at the scene. After the shooting, Byrd left right before Mitchell, but he then waited to get a backpack from Mitchell with proceeds from the robbery. Byrd's statement to the police indicates that Brandon Mitchell told Byrd some things that he should do during the robbery, but those instructions did not extend to the level of 'extreme duress' or 'substantial domination.'

"6. Whether the capacity of [Byrd] to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired—No, this mitigating circumstance does not apply. Although [Byrd's] mental condition does qualify as a mitigating circumstance under [the] catch all provision [of § 13A-5-52, Ala. Code 1975], [Byrd] does not qualify under this section. Even [Byrd's] expert, Dr. Kimberly Ackerson, did not indicate that this would apply. [Byrd] clearly understood the wrongfulness of his acts. He wore gloves to cover up his crime. He hid the

backpack he took from the hotel to avoid detection, and he threw away the clothes he wore during the robbery and killing because 'they were used in a robbery.' (quote from [Byrd's] statement to police). These facts, which were proven at trial, clearly establish that [Byrd] was trying to cover-up his involvement in the offense. [Byrd] also left town after the incident, and when he was arrested he lied to the police about the level of his involvement so as to mitigate his exposure. This Court finds that Roderick Byrd was fully capable of appreciating the criminality of his conduct and capable of conforming his conduct to the law if he had wanted to do so."

(Trial C. 35-36.)

Regarding non-statutory mitigating circumstances, the trial court found:

"1. The childhood trauma of witnessing his mother being killed. Although [Byrd's] testimony did not include information regarding this incident, [Byrd's] aunt testified that when she arrived at the scene of her sister's death Roderick Byrd and the other children were at the scene holding each other. LaTonja McDonald's testimony indicated that [Byrd] was eight or nine years old at the time of the incident, and the record reflects that [Byrd] may have been ten years old when his mother was killed. This was clearly a very traumatic incident which would have adversely affected any child. This also caused [Byrd] to be raised by someone other than his natural parents.

"2. Roderick Byrd's mental condition during his youth and at the time of the offense should also be regarded as a mitigating circumstance. The Court finds [Byrd] had a low IQ as a child, and this made it more difficult for him to learn in school and socialize. He also had an apparent reading disability. [Byrd's] below average intelligence continued into adulthood, and it could have caused Byrd to be a 'follower,' as

72

his sister indicated. Roderick Byrd may not have been a leader throughout his lifetime or even on the date when the murders occurred, but he was certainly capable of making his own decisions. [Byrd's] IQ is approximately 72. This low IQ and the other testimony presented regarding Roderick Byrd's mental condition is sufficient to qualify as a mitigating circumstance under § 13A-5-52, Code of Alabama (1975). This is true even though the record reflects that [Byrd] was not in the mental retardation range."

(Trial C. 36; see also Trial R. 1191-93 (finding, in part, that Byrd's low IQ is a significant mitigating circumstance).)

On appeal, Byrd discounts his trial counsel's efforts—asserting that, "[a]fter their appointment in April 2006, trial counsel basically ignored mitigation for six months." (Byrd's brief, p. 78.) He asserts that counsel should have retained a presentence investigator and that counsel "failed to take any steps to develop" evidence it learned from Byrd's family members—"that [Byrd's] mother was a drug addict, that he had almost died at birth, that he had been in special education and that his family considered him to be 'slow." (Byrd's brief, p. 79.) Byrd asserts that, in April 2007, counsel learned

"additional details about [Byrd's] difficulties in school and his need for counseling after his mother's murder. Despite this, counsel waited another month to obtain a school records release and then …. [t]rial counsel delegated the task of acquiring the school records to Byrd's aunt and did not receive any of the[] records until the eve of trial when there was no

73

time to review them or put them in context with other records and collateral materials, such as medical, DHR and family court records and other evidence (including interviews of teachers, childhood friends and family members), that are basic to any reasonable mitigation investigation."

(Byrd's brief, p. 80.)

Byrd criticizes the "imperfect brick" metaphor that counsel used in closing, arguing that it "actively harmed [Byrd's] chances at receiving mercy by suggesting that he was not only defective but dispensable as well." (Byrd's brief, p. 81.)

Byrd asserts that "a reasonable investigation would have produced a wealth of mitigation evidence." (Byrd's brief, p. 83.) Byrd argues that counsel should have reviewed (or hired an investigator to review) medical records, DHR records, and family and school records. He asserts that, had counsel done so, counsel would have learned about Byrd's "family's extensive history of mental illness and substance abuse, the impact of his mother's substance abuse on his brain development in utero and the challenges he faced as an intellectually disabled child and adolescent without parental or other support." (Byrd's brief, pp. 83-84.) Byrd's brief recounts allegations about his mother's bipolar disorder, suicide attempt, drug addiction, use of alcohol during her pregnancy, and frequent run-

74

ins with DHR; allegations about his biological father's alcoholism, intellectual disability, and imprisonment in 2005 for raping and impregnating a 13-year-old girl; allegations about his siblings' mental illnesses and intellectual disabilities; allegations about Byrd's suffering from PTSD from witnessing his mother's murder; allegations about McDonald's inability to give Byrd "the full attention he required as a teenager"; allegations about Byrd being "essentially homeless" during his adolescence; allegations about teachers and friends who "remember him fondly" and would have told counsel that Byrd "was a good kid who did not cause them any problems"; and allegations about Byrd staying in high school until he was 20 years old but never passing the high-school exit exam or the written test to get a driver's license (Byrd's brief, pp. 84-88.) Byrd asserts further that "expert testimony was necessary to explain and draw conclusions about the social, emotional, psychological and cognitive impact of [Byrd's] traumatic childhood." (Byrd's brief, p. 90.) Byrd characterizes Dr. Ackerson's testimony as inadequate and mere "generalizations and speculation." (Byrd's brief, p. 92.)

Byrd also asserts that counsel should have done "further mitigation work in the … eight weeks" between the jury's recommendation and the

sentencing hearing. (Byrd's brief, p. 81.) He asserts that counsel should have called witnesses and presented evidence at the sentencing hearing.[12] (Byrd's brief, p. 82.)

Byrd argues that "[t]he mitigation evidence that trial counsel failed to gather, prepare and present was not merely 'cumulative' to the other evidence that they actually presented." (Byrd's brief, p. 94.) We disagree.

In Stanley, this Court noted:

"The bulk of the evidence Stanley alleged in his petition should have been presented at the penalty phase of his trial was, in fact, presented. As this Court explained in Brownfield v. State, 266 So. 3d 777 (Ala. Crim. App. 2017):

"'"'"[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir. 2007) (quoting Broom v. Mitchell, 441

---

[12]In State v. Mitchell, 377 So. 3d 94 (Ala. Crim. App. 2022), this Court rejected Brandon Mitchell's claim that his counsel were ineffective for not presenting additional mitigation evidence at the sentencing hearing before the judge. As a part of our rejection of that claim, we noted that precedent existing at the time of Mitchell's trial did not permit the introduction of evidence at the sentencing hearing—trial counsel thus could not have been ineffective for failing to present more mitigation evidence during the sentencing hearing before the trial court. 377 So. 3d at 129-30. As explained in State v. Mitchell, Byrd's trial counsel likewise could not have been ineffective for failing to introduce more evidence at the separate sentencing hearing.

76

F.3d 392, 410 (6th Cir. 2006)).' <u>Eley v. Bagley</u>, 604 F.3d 958, 968 (6th Cir. 2010). 'This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.' <u>United States v. Harris</u>, 408 F.3d 186, 191 (5th Cir. 2005). 'Although as an afterthought this [witness] provided a more detailed account with regard to [mitigating evidence], this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.' <u>Darling v. State</u>, 966 So. 2d 366, 377 (Fla. 2007)."

"'<u>Daniel v. State</u>, 86 So. 3d 405, 429-30 (Ala. Crim. App. 2011).

"'"'[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing.' <u>Hill v. Mitchell</u>, 400 F.3d 308, 319 (6th Cir.), cert. denied, 546 U.S. 1039, 126 S. Ct. 744, 163 L. Ed. 2d 582 (2005). In other cases, we have found prejudice because the new mitigating evidence is 'different from and much stronger than the evidence presented on direct appeal,' 'much more extensive, powerful, and corroborated,' and 'sufficiently different and weighty.' <u>Goodwin v. Johnson</u>, 632 F.3d 301, 328,

331 (6th Cir. 2011). We have also based our assessment on 'the volume and compelling nature of th[e new] evidence.' Morales v. Mitchell, 507 F.3d 916, 935 (6th Cir. 2007). If the testimony 'would have added nothing of value,' then its absence was not prejudicial. [Bobby v.] Van Hook, [558 U.S. 4, 12,] 130 S. Ct. [13,] 19, 175 L. Ed. 2d 255 [(2009)]. In short, 'cumulative mitigation evidence' will not suffice. Landrum v. Mitchell, 625 F.3d 905, 930 (6th Cir. 2010), petition for cert. filed (Apr. 4, 2011) (10-9911)."

"'Foust v. Houk, 655 F.3d 524, 539 (6th Cir. 2011). "'[A] claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence will not be sustained where the jury was aware of most aspects of the mitigation evidence that the defendant argues should have been presented.'" Walker v. State, 194 So. 3d 253, 288 (Ala. Crim. App. 2015) (quoting Frances v. State, 143 So. 3d 340, 356 (Fla. 2014)).'

"266 So. 3d at 810."

335 So. 3d at 60-61. This Court in Stanley held:

"Here, the jury and the trial court were aware of most aspects of the mitigating evidence Stanley alleged in his petition should have been presented. '"[T]he notion that the result could have been different if only [counsel] had put on more than the ... witnesses he did, or called expert witnesses to bolster his case, is fanciful."' Stallworth v. State, 171 So. 3d 53, 80 (Ala. Crim. App. 2013) (quoting Wong v. Belmontes, 558 U.S. 15, 28, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009)). Moreover, the additional evidence Stanley identified in his

petition that was not presented at his trial was not so strong as to create a reasonable probability that the outcome of the trial would have been different had the evidence been presented. We have reweighed the evidence in aggravation against the totality of the evidence in mitigation, both that presented at trial and that pleaded in Stanley's petition, and we have no trouble concluding that the additional mitigating evidence would not have altered the balance of aggravating circumstances and mitigating circumstances in this case. This is so even assuming that the additional mitigating evidence would have swayed more of, or even all, the jurors to vote for life imprisonment without the possibility of parole. In light of the strength of the three aggravating circumstances and the relative weakness of the totality of the mitigating evidence, the additional weight to be afforded a unanimous jury recommendation of life imprisonment without the possibility of parole would not have altered the balance of aggravating and mitigating circumstances. Therefore, trial counsel were not ineffective in this regard, and the circuit court properly summarily dismissed this claim of ineffective assistance of counsel."

335 So. 3d at 61. Under that same analysis, we reach the same conclusion here that this Court reached in Stanley. Byrd's counsel were not ineffective at the penalty phase, and Byrd is due no relief on this issue.

CONCLUSION

The judgment of the circuit court is affirmed.

AFFIRMED.

Windom, P.J., concurs. Kellum, J., concurs in the result. Cole and Anderson, JJ., recuse themselves.

79